IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| McDONALD'S CORPORATION and<br>McDONALD'S USA, LLC. | ) <br> ) <br> ) |
| Plaintiffs, | ) <br> ) |
| V, | ) <br> ) |
| HOMELAND INSURANCE COMPANY OF<br>NEW YORK and AmGUARD INSURANCE<br>COMPANY, | ) <br> ) <br> )    **JURY DEMANDED** |
| Defendants. | ) <br> ) |

## **COMPLAINT**

Plaintiffs McDonald's Corporation and McDonald's USA, LLC., for their complaint against defendants Homeland Insurance Company of New York and AmGUARD Insurance Company, state as follows:

## **PARTIES**

1.  McDonald's Corporation is a corporation organized under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois.

2.  McDonald's USA, LLC. is a limited liability company organized under the laws of the State of Delaware with its principal place of business located in Chicago, Illinois. The sole member of McDonald's USA, LLC. is McDonald's. Corporation.

3.  On information and belief, Homeland Insurance Company of New York ("Homeland") is a corporation organized under the laws of the State of New York with its principal place of business located in Plymouth, Minnesota.

4.   On information and belief, AmGUARD Insurance Company ("AmGuard") is a corporation organized under the laws of the State of Pennsylvania with its principal place of business located in Wilkes Barre, Pennsylvania.

## JURISICTION AND VENUE

5.   This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the plaintiffs and defendants are citizens of different states, and the amount in controversy (exclusive of interest and costs) exceeds $75,000.

6.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and all defendants are subject to personal jurisdiction in this judicial district.

## SUMMARY

7.   Defendants Homeland and AmGuard each provided insurance to a McDonald's franchisee who operated a restaurant involved in litigation filed in the Circuit Court of Cook County, Illinois. Plaintiffs McDonald's Corporation and McDonald's USA, LLC. (collectively, "McDonald's") were additional insureds under the policies that Homeland and AmGuard provided and were also defendants in this litigation. McDonald's tendered the claim to Homeland and AmGuard (among other insurers); Homeland and AmGuard wrongfully denied coverage, and wrongfully refused to defend McDonald's. McDonald's therefore seeks reimbursement for the attorneys' fees and legal expenses it incurred in defending the underlying claim.

## OPERATIVE FACTS

### The Acuna Litigation and McDonald's Insurance Coverage

8.   On November 21, 2019, Sonia Acuna and other plaintiffs filed a complaint against McDonald's, McDonald's Restaurants of Illinois, Inc. and several McDonald's franchisees,

commencing *Sonia Acuna, et al. v. McDonald's Corporation, et al.*, Case No. 2019CH13477 in the Circuit Court of Cook County, Illinois (the "Acuna Litigation"). A copy of the complaint in the Acuna Litigation (without exhibits) is attached hereto as Exhibit A.

9. The plaintiffs in the Acuna Litigation alleged, among other things, that conditions in McDonald's restaurants were unsafe due to violent acts from customers and fellow workers, that they and others suffered bodily injuries as a result of those conditions, and that they were entitled to damages because of those bodily injuries. They also alleged that, as a franchisor and landlord, McDonald's was responsible because (among other reasons) it controlled the restaurants' designs and other working conditions at the restaurants. *See*, for example, Complaint, ¶¶ 10-17, 26, 96-106, 181, and 205-208.

10. Plaintiffs sought damages from McDonald's and specifically asserted that those damages could be obtained despite the Illinois Worker's Compensation Act because plaintiffs were not employees of McDonald's. ¶ 20.

11. The Acuna Litigation was not well-founded. Through motion practice, McDonald's and the franchisees obtained dismissals of virtually all of the plaintiffs, including Sonia Acuna (the named plaintiff in the complaint), without paying any amounts in settlement or judgment.

12. McDonald's and the franchisees tendered the Acuna Litigation claim to the insurance carriers for all of the applicable franchisees. Most of the carriers accepted their duty to defend McDonald's and the other defendants and agreed with McDonald's to allocate and pay defense costs on a *pro rata* basis, with each carrier and McDonald's paying a share of the defense costs based on the number of plaintiffs working at stores it insured.Under the proposed agreement, McDonald's would pay a portion of the defense costs itself in exchange for (among other things) the covering insurance carriers' agreements to become immediately obligated to pay their

3

allocated share of defense costs and to permit McDonald's to retain the defense counsel of its choosing.

13. Because Homeland and AmGuard denied coverage and breached their duty to defend, McDonald's USA, LLC. was obligated to pay (and has paid or expects to pay) the defense costs allocated to Homeland and AmGuard. In addition, both Homeland and AmGuard each have a duty to reimburse McDonald's for all of the other defense costs that McDonald's has paid or will pay (including the amounts McDonald's was obligated to pay, and has paid or expects to pay, pursuant to the allocation of defense costs described above).

**Sonia Acuna and Insurance for her Specific Claims**

14. According to the complaint in the Acuna Litigation, Sonia Acuna worked at the McDonald's restaurant located at 5015 West Madison Street, Chicago, Illinois from 2013 through the filing of the complaint. ¶ 40.

15. From the beginning of that time period through May 15, 2018, Lofton & Lofton & Lofton Management, Inc. ("Lofton") operated that restaurant as a franchisee and tenant of McDonald's USA, LLC.

16. Homeland issued liability insurance policies to Lofton covering the period from March 1, 2016, through March 1, 2018. AmGuard issued a liability insurance policy to Lofton covering the period from March 1, 2018, through March 1, 2019. McDonald's is an additional insured under each of these policies. On information and belief, Lofton timely paid all premiums for these insurance policies.

17. In her complaint, Sonia Acuna alleged, among other things:

    a. "Plaintiffs are regularly exposed to violent and criminal behavior by customers." ¶ 4.

b. "Plaintiffs suffered physical and psychological harm from the violence they experienced while working at McDonald's Restaurants." ¶ 5.

c. "As described below, many Plaintiffs have been the victims of violence in the workplace. Others have witnessed violence at work and, as a result, fear for their safety in the future." ¶ 53

d. "Plaintiff Sonia Acuna has witnessed and been affected by violence while working at the McDonald's Restaurant at 5015 W. Madison Street in Chicago." ¶ 59.

e. "It is common for customers to come to the restaurant intoxicated during her shift and act violently." ¶ 59.b.

f. "Acuna witnessed customers throw coffee at co-workers approximately once a month." ¶ 59.f.

g. Damages in excess of $50,000. *See* pp. 47-48 and 49-40.

18. Homeland had a duty to defend McDonald's against Acuna's claims. In particular, its policies provided, among other things:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

19. AmGuard also had a duty to defend McDonald's against Acuna's claims, because its policy contained a virtually identical coverage provision. AmGuard's policy provided:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages.

20. McDonald's tendered its claims for insurance to Homeland and to AmGuard on March 5, 2020. Copies of McDonald's notice letters are attached as Exhibits B and C.

21. Homeland did not provide a coverage response to McDonald's for approximately 17 months, despite repeated requests from McDonald's that it do so. On August 12, 2021, Homeland denied McDonald's claim and denied that it had a duty to defend McDonald's. *See* Exhibit D. Homeland stated (on p. 7), among other things, that:

> Plaintiff Sonia Acuna, who works or worked at the store location listed in the Lofton Policy, alleges that she worked at the McDonald's located at 5015 West Madison Street, Chicago, IL, for several years leading up to the Complaint. However, the only incidents mentioned in her Complaint took place beginning in January 2019, after the Lofton Policy expired on March 1, 2018. Thus, the allegations fall outside the Homeland Policy period and Homeland therefore declines to provide coverage for defense or indemnification of McDonald's related to the Action.

22. Homeland's grounds for denying coverage were incorrect. Among other things, Acuna alleged that violent conduct occurred at the restaurant during the entire time that she worked at the restaurant (beginning in 2013). *See supra*. The complaint also alleges that  Acuna (and all the other plaintiffs) suffered psychological injury as a result of witnessing acts of violence and bodily injury suffered by third parties. *See supra*. Finally, the complaint alleges that all plaintiffs suffered physical injury as well as psychological injury from witnessing violence directed at others. *Supra*.

23. AmGuard denied coverage and refused to defend McDonald's on April 29, 2020, asserting that an employment practices exclusion applied to preclude coverage. *See* Exhibit E, pp. 3-4.

24. AmGuard's grounds for denying coverage were incorrect. To begin with, courts have found that this exclusion only applies to prospective, existing or past employees, and Acuna was never an employee of McDonald's—she was an employee of Lofton. In addition, courts have

6

found that "employment practices" as used in this exclusion are limited to employment actions directed against the underlying plaintiff ("such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person."). Acuna's claims against McDonald's are not based on allegations that McDonald's took any employment action against Acuna.

25. Neither AmGuard nor Homeland filed a declaratory judgment action against McDonald's or any other party regarding the Acuna claim.

26. The Acuna plaintiffs filed multiple amended complaints in the litigation, but the allegations related to Acuna herself remained materially the same until Acuna was dropped as a plaintiff in the Fourth Amended Complaint, filed on December 29, 2021.

27. McDonald's was damaged as a result of Homeland's and AmGuard's refusal to defend McDonald's in the Acuna Litigation, In particular, McDonald's USA, LLC has paid or expects to pay $139,164.31 in attorneys' fees and legal expenses for defense costs in the Acuna litigation through December 29, 2021.

## COUNT I:
## BREACH OF CONTRACT

1. – 27.  McDonald's realleges and incorporates the allegations of Paragraphs 1-27 above as the allegations of paragraphs 1–27 of Count I.

28. The insurance policies issued by Homeland and AmGuard constituted contracts.

29. McDonald's was a party to these insurance contracts because, among other things, McDonald's was a named insured.

30. Homeland and AmGuard breached the insurance contracts by, among other things, refusing to defend McDonald's in the Acuna litigation.

31. As a result of the breaches by Homeland and AmGuard, McDonald's was damaged in the amount of $139,164.31.

WHEREFORE, plaintiffs McDonald's Corporation, McDonalds USA, LLC. and McDonald's Restaurants of Illinois, Inc., respectfully request that this Court enter judgment in their favor and against defendants Homeland Insurance Company of New York and AmGUARD Insurance Company, jointly and severally, in the amount of compensatory damages proven in this matter, interest, and for such further relief as this Court deems proper.

**COUNT II:**
**UNREASONABLE AND VEXATIOUS DENIAL OF INSURANCE CLAIM**

1. – 31.  McDonald's realleges and incorporates the allegations of Paragraphs 1-31 above as the allegations of paragraphs 1–31 of Count II.

32. In response to the refusals of Homeland and AmGuard to honor their duties to defend, McDonald's sent correspondence to the carriers explaining why their denials were erroneous, including citations to applicable case law. Neither Homeland nor AmGuard responded to this correspondence or disputed McDonald's position.

33. Homeland's and AmGuard's denial of McDonald's claims with respect to the Acuna Litigation and refusal to defend McDonald's in the Acuna Litigation were unreasonable and vexatious as described in 215 ILCS 5/155(1).

34. McDonald's has incurred significant attorneys' fees and other litigation costs as a result of Homeland's and AmGuard's wrongful denial of coverage and refusal to defend McDonald's.

WHEREFORE, in addition to the amounts awarded under Count I, plaintiffs McDonald's Corporation, McDonalds USA, LLC. and McDonald's Restaurants of Illinois, Inc., respectfully request that this Court enter judgment in their favor and against defendants Homeland Insurance

8

Company of New York and AmGUARD Insurance Company, jointly and severally, in the amount of (a) the attorneys' fees and legal expenses they have incurred in pursuing this action, (b) the additional amounts described in 215 ILCS 5/155(1), and (c) for such further relief as this Court deems proper.

## **JURY DEMAND**

Plaintiffs hereby demand trial by jury on all causes of action and claims asserted in this Complaint.

McDONALD'S CORPORATION, and
McDONALD'S USA, LLC.

Date:   November 28, 2023                    By:    Bradley Block_____
                                                     One of their Attorneys

Bradley Block
Law Offices of Bradley Block
318 West Adams Street
Suite 1722
Chicago, Illinois 60607
224-533-1075
brad.block@bradblocklaw.com

**12-Person Jury**

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

|  |  |
|---|---|
| SONIA ACUÑA, ADRIANA ALVAREZ, LAKARA BAILEY, DESHAWN BELL, BRENDA CARBAJAL, TERESA CERVANTES, CARLOS DeLEON, JOSEFINA GARDUNO, ELVIRA GONZALEZ, DESIREA JOHNSON, YOLANDA LEYVA, MARTINA ORTEGA, GRACIELA RIVERA, DIANA THOMAS, MARIA TORRES, IESHIA TOWNSEND, and REYNA VASQUEZ, | Hearing Date: 3/20/2020 10:00 AM - 10:00 AM<br>Courtroom Number: 2410<br>Location: District 1 Court<br>Cook County, IL |
| Plaintiffs, | No. 2019CH13477 |
| v. | IN CHANCERY<br>FOR INJUNCTION |
| McDONALD'S CORPORATION, McDONALD'S USA, LCC, McDONALD'S RESTAURANTS OF ILLINOIS, INC., NELSON ENTERPRISES, INC., JOKAT CO., INC., NORNAT V, INC., HQ 39148, LLC, KARAVITES RESTAURANT 5895, INC., BRITTLAN V, LLC, INFINITE BUENA VIDA, LLC, NORNAT, INC., RMC ADAMS-WELLS, LLC, RMC LOOP ENTERPRISES, LLC, NORNAT IX, INC., and OMAKIN RESTAURANTS LLC | FILED<br>11/21/2019 7:49 AM<br>DOROTHY BROWN<br>CIRCUIT CLERK<br>COOK COUNTY, IL<br>2019CH13477 |
| Defendants. | |

*FILED DATE: 11/21/2019 7:49 AM   2019CH13477*

**COMPLAINT**

Barry M. Bennett
George A. Luscombe III
Stephen A. Yokich
DOWD, BLOCH, BENNETT,
   CERVONE, AUERBACH & YOKICH
8 South Michigan Avenue, 19th Floor
Chicago, Illinois 60603
Tel: (312) 372-1361

David P. Dean*
Daniel M. Rosenthal*
Ryan E. Griffin*
Michael P. Ellement*
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave. NW, Suite 950
Washington, DC 20036
Tel: (202) 496-0500

1

EXHIBIT A

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

Fax: (312) 372-6599
Email: bbennett@laboradvocates.com
Firm I.D. Number: 12929

David H. Seligman*
1535 High St.
Denver, CO, 80218
Tel: (720) 248-8426
Email: david@towardsjustice.org

*Registration under Rule 707 pending.

Fax: (202) 496-0555
Email: dmrosenthal@jamhoff.com

*Attorneys for Plaintiffs*

2

FILED DATE: 11/21/2019 7:49 AM 2019CH13477

Plaintiffs Sonia Acuña, Adriana Alvarez, Lakara Bailey, Deshawn Bell, Brenda Carbajal, Teresa Cervantes, Carlos DeLeon, Elvira Gonzalez, Josefina Garduno, Desirea Johnson, Yolanda Leyva, Martina Ortega, Graciela Rivera, Diana Thomas, Maria Torres, Ieshia Townsend, and Reyna Vazquez state as their complaint against Defendants McDonald's Corporation, McDonald's USA, LCC, McDonald's Restaurants of Illinois, Inc., Nelson Enterprises, Inc., Jokat Co., Inc., Nornat V, Inc., Karavites Restaurant 5895, Inc., Brittlan V, LLC, Infinite Buena Vida, LLC, Nornat, Inc., RMC Adams-Wells, LLC, RMC Loop Enterprises, LLC, Nornat XI, Inc., and Omakin Restaurants LLC:

## JURISDICTION AND VENUE

1.      This complaint alleges violations of Illinois common law for negligence. This Court maintains jurisdiction over this action under 735 Ill. Comp. Stat. 5/2-209(a)(1), (2), and (3), because Defendants have transacted business within Illinois, committed tortious acts within Illinois, and own, use, or possess real estate situated within Illinois.

2.      Venue is proper in this judicial district under 735 Ill. Comp. Stat. 5/2-101 because Defendants are residents of this county and the facts underlying this complaint substantially occurred in this county.

## INTRODUCTION

3.      Plaintiffs work at McDonald's restaurants in the Chicago area. They bring this case because they and their coworkers face a daily risk of violence while at work. Defendants have been and continue to be negligent in failing to protect their workers from this risk.

3

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

4.     Plaintiffs are regularly exposed to violent and criminal behavior by customers. At the McDonald's restaurants where Plaintiffs work, the following incidents—among many others—have occurred: a customer jumped over the counter and threatened employees with a gun; a customer jumped over the counter, disrobed, and threw kitchen equipment at workers; customers exposed their genitals to Plaintiffs, made lewd comments to them, and groped them; a customer hit a Plaintiff on the back with a "Wet Floor" sign; a customer pushed a Plaintiff against the wall and spit in her face; a dead body and large amounts of blood were found in the bathroom.

5.     Plaintiffs suffered physical and psychological harm from the violence they experienced while working at McDonald's restaurants. Those who continue to work at the restaurants fear that they will face violence in the future.

6.     The incidents described in this complaint are not random or unforeseeable. Rather, they are part of a citywide and nationwide pattern at McDonald's restaurants. Further, they are the result of choices made by McDonald's that undermine safety.[1]

7.     In the Chicago area, emergency service providers receive more than 20 calls per day, on average, from McDonald's restaurants. Violence at McDonald's restaurants in Chicago is regularly reported in the media. For example, in May 2019, the media reported that a person was shot and killed in a McDonald's restaurant.  In April 2019, the media

---

[1]     As described further below, Defendants McDonald's Corporation and McDonald's USA LLC are corporate entities that jointly run the McDonald's system in the United States. We refer to these entities collectively as "McDonald's." We use the term "McDonald's restaurants" to refer to restaurants operated under the McDonald's brand. Many McDonald's restaurants are operated under franchise agreements with McDonald's, and we refer to these restaurants at times as "Franchise Stores." Other McDonald's restaurants are operated by wholly-owned subsidiaries of McDonald's, and we refer to these restaurants at times as "Corporate Stores."

4

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

reported that a security guard at a McDonald's restaurant was assaulted; police had been called to the same store location more than thirty times in the previous month.

8.     Nationwide, according to another recent article, American local news outlets deliver a new report on violence at a McDonald's restaurant roughly every 36 hours, on average. Yet, since most violent crimes go unreported, the actual incidence of violence is likely much higher than local news reflects.

9.     At the highest levels of the company, McDonald's is aware of the security risks faced by workers at McDonald's restaurants. McDonald's has a nationwide security team whose top official has acknowledged the obligation of McDonald's to protect workers from crime and violence. Further, McDonald's receives detailed crime reports from a company called CAP Index, which describes itself as "the leader in crime risk forecasting."

10.     Yet, McDonald's has failed to protect workers from these risks. For example, to increase profits, Defendants decided to keep their stores open late at night, when the risk of crime increases substantially. But Defendants ignore best practices for the safe operation of late-night businesses.

11.     Many recommended security practices relate to the physical design of business premises. For example, experts recommend placing strong physical barriers between workers and customers in late-night businesses, but Defendants have torn down or lowered check-out counters as part of a nationwide remodeling effort. Experts also recommend ensuring high visibility into and out of business premises, but Defendants have plastered their windows with advertising material, thereby impairing visibility.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

12.     Aside from the physical design of business premises, experts emphasize the need for comprehensive employee training, but Defendants have failed to provide even the most basic security training to most of their workers and managers.

13.     Plaintiffs have also been put at risk by other policies implemented by Defendants. For example, when violent incidents occur, store managers have discouraged Plaintiffs from calling law enforcement authorities, seemingly out of a misguided belief that a police presence would repel customers.

14.     Plaintiffs bring claims both against McDonald's and against the operators of the McDonald's restaurants where they work. Because McDonald's controls many of the factors giving rise to the risk of violence faced by Plaintiffs, any effective relief must require McDonald's to cease its negligent conduct.

15.     McDonald's selects the locations of all McDonald's restaurants and owns or leases the property on which those restaurants operate. Indeed, according to the company's corporate filings, McDonald's makes approximately one third of its revenue by leasing or subleasing such property to franchisees.

16.     McDonald's also controls and coordinates the physical design of McDonald's restaurants, a critical factor leading to the high risk of violence faced by Plaintiffs.

17.     Further, McDonald's trains all managers, including those who work at Franchise Stores, at "Hamburger University," which it operates. McDonald's also controls training material used by other employees at both corporate-owned and franchised stores. And McDonald's dictates many of the other policies that have given rise to Plaintiffs' injuries.

6

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

18.     For their part, restaurant operators implement the mandates issued by McDonald's and thus share liability for the harmful effects of those dictates.

19.     Defendants have been negligent in violation of Illinois law through their disregard for the safety of Plaintiffs and their co-workers. Plaintiffs therefore seek injunctive relief requiring Defendants to protect employees from violence at work.

20.     In addition, Plaintiffs seek monetary relief from McDonald's. Although damages claims against employers are preempted by the Illinois workers' compensation system, employees may seek damages from other entities that have contributed to their injuries. Here, McDonald's disclaims any employment relationship with Plaintiffs, so Plaintiffs are entitled to seek damages from McDonald's.

## PARTIES

21.     McDonald's Corporation is a Delaware corporation with its principal place of business located at 110 North Carpenter Street, Chicago, Illinois. It operates and franchises McDonald's restaurants.

22.     McDonald's USA, LLC is a Delaware corporation with its principal place of business located at 110 North Carpenter Street in, Chicago. It is a wholly owned subsidiary of McDonald's Corporation. It franchises McDonald's restaurants (referred to as "Franchise Stores") and operates other McDonald's restaurants through wholly-owned subsidiaries (referred to as "Corporate Stores.").

23.     As noted above in footnote 1, this Complaint refers collectively to McDonald's Corporation and McDonald's USA, LLC as "McDonald's."

7

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

24.     McDonald's Restaurants of Illinois, Inc., is an Illinois corporation with its principal place of business in Illinois. It is a wholly-owned subsidiary of McDonald's USA LLC and operates Corporate Stores in Illinois, including the Corporate Store located at 2609 S. Kedzie Ave. in Chicago.

25.     Across Illinois, there are approximately 615 McDonald's restaurants, of which approximately 47 are Corporate Stores. In the Chicago area, there are approximately 100 Franchise Stores and 30 Corporate Stores.

26.     As described further below, Franchise Stores are generally located on land and in buildings owned by McDonald's and are operated pursuant to strict requirements imposed by McDonald's.

27.     Defendant Nelson Enterprises, Inc., is an Illinois corporation that owns and operates a Franchise Store at 111 W. Madison St., Oak Park, Illinois.

28.     Defendant Jokat Co., Inc., is an Illinois corporation that owns and operates a Franchise Store at 2827 S. Cicero Ave., Cicero, Illinois.

29.     Defendant Nornat V, Inc., is an Illinois corporation that owns and operates a Franchise Store at 36 W. 95th St. in Chicago.

30.     Defendant HQ 39148, LLC, is an Illinois corporation that owns and operates a franchise store at 1035 W. Randolph St. in Chicago, inside the McDonald's global headquarters.

31.     Defendant Karavites Restaurant 5895, Inc., is an Illinois corporation that owns and operates a Franchise Store at 1004 W. Wilson in Chicago.

32.     Defendant Brittlan V, LLC, is an Illinois corporation that owns and operates Franchise Stores at 1443 E. 87th St., Chicago, Illinois and 9560 S. Halstead St in Chicago.

8

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

33.     Defendant Infinite Buena Vida, LLC, is an Illinois corporation that owns and operates a Franchise Store at 2425 E. 79th St. in Chicago.

34.     Defendant Nornat, Inc., is an Illinois corporation that owns and operates a Franchise Store at 9211 S. Commercial in Chicago.

35.     Defendant RMC Adams-Wells, LLC, is an Illinois corporation that owns and operates a Franchise Store at 180 W. Adams in Chicago.

36.     Defendant RMC Loop Enterprises, LLC, is an Illinois corporation that owns and operates a Franchise Store at Union Station, 225 S. Canal St. in Chicago.

37.     Defendant Nornat XI, Inc., is an Illinois corporation that owns and operates a Franchise Store at 6900 S. Lafayette Ave. in Chicago.

38.     Defendant Omakin Restaurants LLC is an Illinois corporation that owns and operates a Franchise Store at 5015 W. Madison St. in Chicago.

39.     The Defendants described in paragraphs 27 to 38 above are collectively referred to in this Complaint as the "Franchisee Defendants."

40.     Plaintiff Sonia Acuña is a resident of Illinois. She has worked at the McDonald's restaurant at 5015 W. Madison St. in Chicago for six years.

41.     Plaintiff Adriana Alvarez is a resident of Illinois. She has worked at the McDonald's restaurant at 2827 S. Cicero Ave. in Cicero for eight years.

42.     Plaintiff Lakara Bailey is a resident of Illinois. She has worked at the McDonald's restaurant at 9560 S. Halsted St. in Chicago for approximately four years.

43.     Plaintiff Deshawn Bell is a resident of Illinois. He worked at the McDonald's restaurant at 111 West Madison in Oak Park for approximately ten years until January 17, 2019.

9

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

44.     Plaintiffs Brenda Carbajal, Martina Ortega, and Maria Torres are residents of Illinois.  Carbajal worked at the McDonald's restaurant at 36 W. 95th St. in Chicago for approximately one year, until April 2019. Ortega and Torres currently work at that restaurant.

45.     Plaintiff Teresa Cervantes is a resident of Illinois. She works at the McDonald's restaurant at 1035 W. Randolph in Chicago, inside the McDonald's global headquarters.

46.     Plaintiffs Carlos DeLeon, Yolanda Leyva, and Reyna Vasquez are residents of Illinois. They work at the McDonald's restaurant at 180 W. Adams St. in Chicago.

47.     Plaintiff Josefina Garduno is a resident of Illinois. She works at the McDonald's restaurant inside Union Station, 225 S. Canal St. in Chicago.

48.     Plaintiff Elvira Gonzalez is a resident of Illinois. She works at the McDonald's restaurant at 1004 W. Wilson in Chicago.

49.     Plaintiff Desirea Johnson is a resident of Illinois. She works at the McDonald's restaurant at 2609 S. Kedzie Ave. in Chicago.

50.     Plaintiff Graciela Rivera is a resident of Illinois.  She has worked at the McDonald's restaurant at 9211 S. Commercial Ave. in Chicago for seven years.

51.     Plaintiff Diana Thomas is a resident of Illinois. She worked at the McDonald's restaurant at 6900 S. Lafayette Ave in Chicago from approximately 2017 to 2019. Thomas currently works at a different McDonald's restaurant.

52.     Plaintiff Ieshia Townsend is a resident of Illinois. She works at the McDonald's restaurant at 2425 East 79th Street in Chicago.

10

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

## FACTUAL ALLEGATIONS

**I.**     **Plaintiffs have experienced violence at work and reasonably fear for their safety.**

53.     As described below, many Plaintiffs have been the victims of violence in the workplace. Others have witnessed violence at work and, as a result, fear for their safety in the future.

54.     Plaintiff Elvira Gonzalez was assaulted twice while working at the McDonald's restaurant at 1004 W. Wilson in Chicago. She has repeatedly asked restaurant management for protection against customer abuse and assault, but management has refused to intervene.

a.  Gonzalez was mopping outside a locked bathroom in late summer or early fall of 2018 when a man began to yell at her. The man then picked up a "Wet Floor" sign and hit Gonzalez with it. Gonzalez still has pains in her neck and back from the attack.

b.  The shift manager did not call the police following this attack. Gonzalez told the store manager the next day and he said he would call the police if the man returned to the restaurant. However, when the man returned and Gonzalez pointed him out to the manager, he still refused to call the police.

c.  On a later occasion, when Gonzalez was cleaning inside the men's bathroom, a different man came in, exposed himself to her, and groped her. She ran out, screamed, and told the manager the customer was trying to molest her. The manager laughed and said there was nothing wrong with that and she should let him "make love to you."

11

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

    d.   The man who exposed himself to Gonzalez and groped her has returned to the store more than once and has verbally harassed Gonzalez. But managers have refused to call the police and have told her that there is nothing wrong with somebody "flattering" her that way.

55.    Plaintiff Graciela Rivera has been assaulted by customers on multiple occasions while working at the McDonald's restaurant at 9211 S. Commercial Ave. in Chicago. In addition, she has witnessed other acts of violence in the restaurant. She has repeatedly asked restaurant management for protection against customer abuse, but managers have refused to intervene and have instead mocked her.

    a.   In approximately the spring of 2019, Rivera was cleaning the men's bathroom when a man entered the bathroom. As Rivera tried to leave, the man exposed himself to her and urinated on her. Rivera told her manager, but the manager laughed at her and told her that it was her fault because "she likes to look at men's [private parts]." The man who urinated on her is a regular customer who continues to visit the restaurant on a near daily basis.

    b.   Also around spring 2019, another regular customer grabbed Rivera by the shirt collar in the store lobby and put his hand down her shirt to grab at her chain necklace. As the man continued to feel down her shirt, he told Rivera she should not have her chain out because someone might try to steal it. Rivera reported the incident to her manager immediately, but he laughed at her and told her she should have just let the customer touch her. The manager also told her that the cameras in the lobby, which should have captured the assault, do not work.

FILED DATE: 11/21/2019 7:49 AM 2019CH13477

c. Shortly afterwards, the same customer put a large rock on the hood of Rivera's car. Rivera asked the manager to look at the camera footage from the parking lot, but the manager told her that he could not make out the man's license plate so nothing could be done.

d. Around September 2019, Rivera saw a man seated at a table when two men entered the store from different doors and proceeded to attack him. The two assailants beat the man's head against the floor. The manager did nothing, but three female employees tried to intervene. One of the assailants pushed one of the employees into a chair, injuring her elbow.

56. Plaintiff Lakara Bailey has been assaulted by a customer and stalked by another customer while working at the McDonald's restaurant at 9560 S. Halsted St. in Chicago.

a. A customer threw a sandwich at Bailey's face through the drive-thru window. Bailey tried to walk away from the drive-thru window after the attack, but a manager grabbed Bailey's arm to prevent her from doing so.

b. In September 2019, a regular at the restaurant approached one of Bailey's co-workers with a picture of Bailey and asked to see her. There was a security guard on duty, but he remained seated at a table, and laughed when the man asked for Bailey. The following day, a co-worker called Bailey to tell her that the man was looking for her. Bailey was disturbed and expressed her concern to the manager. On information and belief, a McDonald's District Supervisor told the store manager that Bailey should not have been told the man was looking for her.

13

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

57.     Plaintiff Teresa Cervantes has been abused by customers on several occasions while working at the McDonald's restaurant at 1035 W. Randolph in Chicago. She has repeatedly asked restaurant management for protection against customer abuse and assault, but management has refused to intervene.

a.  Cervantes is regularly required to clean the women's and men's bathrooms. On several occasions, Cervantes was cleaning inside the men's bathroom when men entered and exposed themselves to her in a sexual manner.

b.  One man has exposed himself to Cervantes on a number of occasions and told her on one occasion, in approximately fall of 2019, that he would "wait for you outside." Cervantes told the manager about this incident and asked for protection when she left the restaurant that night. But the manager said that was not his job.

c.  When Cervantes has told managers about this and other similar incidents, the managers have responded that they cannot do anything. When Cervantes continued to complain, managers have said she should get a new job if she does not like this one.

d.  There are no locks on the bathrooms, and the store does not provide signs that Cervantes can post to show that the bathrooms are not available while being cleaned. She sometimes uses a "Wet Floor" sign to indicate that the bathroom is being cleaned, but customers often ignore it. Further, managers have told Cervantes she is not allowed to use the sign, while declining to provide her any other option for protecting herself when cleaning bathrooms.

14

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

e. On or around October 2, 2019, Cervantes asked an UberEats driver to get off a table he was sitting on. The driver verbally assaulted her, followed her toward the bathroom where she was cleaning and yelled at her, as did another customer. About 30 minutes later, a manager told her, someone called the restaurant and said that they would come and kill everyone in the store. The manager did not call police. The customer returned the next day and laughed at Cervantes in a taunting manner.

58. Plaintiffs Brenda Carbajal, Martina Ortega, and Maria Torres have witnessed customer attacks and threats toward employees, and fights between customers, while working at the McDonald's restaurant at 36 W. 95th St. in Chicago.

a. The restaurant lowered its service counter in April 2018, which led to several instances of customers climbing on top of or over the counter to attack employees.

b. On December 30, 2018, Carbajal and Torres witnessed parts of an incident in which a male customer harassed a female customer and jumped over the service counter to threaten employees. The customer had a gun, which he waved at employees, and he physically assaulted another customer.

c. Carbajal has frequently seen customers throw items at workers. On one occasion, a manager responded by throwing items back at the customer. When Carbajal questioned another manager about safety, the manager instructed her to fight back by throwing anything available at the customers, including hot oil from the fryer. Carbajal, shocked at the instruction, asked if the restaurant actually wanted her to throw items at customers, and asked

15

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

whether the company would defend her if she hurt a customer in the process. The manager responded that Carbajal was on her own if she injured a customer.

    d.  Carbajal and Ortega witnessed a customer jump over the service counter, take off her clothes, and throw equipment at workers.

    e.  In September 2018, Torres saw an angry customer jump over the service counter. When a worker confronted the customer, he grabbed the worker by the arms, shook her, and said when she got off work he was going to beat her.

    f.  Also in September 2018, Torres saw a customer throw items from the service counter at an employee and then grab the employee from across the counter.

59.    Plaintiff Sonia Acuña has witnessed and been affected by violence while working at the McDonald's restaurant at 5015 W. Madison St. in Chicago.

    a.  Acuña works in the kitchen during the overnight shift.

    b.  It is common for customers to come to the restaurant intoxicated during her shift and to act violently.

    c.  In January or February 2019, a dead body was found in the restaurant's restroom. Acuña went into the restroom after the police left with the body. She saw blood everywhere.

    d.  In February 2019, a customer pepper sprayed employees working the registers at the restaurant. Acuña, who was in the back kitchen at the time, could not breathe because of the spray. The restaurant manager was present, but did not call the police.

16

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

e.  On another occasion, in approximately March 2019, prior to Acuña's shift, a
drive-thru customer entered the store, accessed the register area, and
physically assaulted a worker. Acuña arrived after the customer had left and
saw a large amount of blood in the restaurant as a result of the assault. The
employee had to be taken away in an ambulance.

f.  Acuña has witnessed customers throw coffee at co-workers approximately
once a month. Managers are aware of these instances, but do not call the
police.

60.  Plaintiff Ieshia Townsend has witnessed violent acts while working at the
McDonald's restaurant at 2425 East 79th Street in Chicago. Customers regularly threaten
employees. In approximately the summer of 2019, Townsend witnessed a customer
threaten to jump over the counter and slap an employee. On information and belief, on
another occasion in the summer of 2019, a customer threatened to shoot employees, and in
the summer of 2018, a customer tried to pull an employee outside through the drive-thru
window. The restaurant manager has admitted to Townsend that there is not enough
security in the store.

61.  Plaintiffs Carlos DeLeon, Yolanda Leyva, and Reyna Vasquez witnessed a
customer attack a co-worker on May 30, 2019 at the McDonald's restaurant at 180 W.
Adams St. in Chicago. The restaurant has split service counters with no barrier to the
employees-only area, which allowed the customer to enter and attack the worker in that
area. The assailant knocked the employee to the ground and continued throwing punches
at the worker while other customers tried to intervene. The employee suffered a

FILED DATE: 11/21/2019 7:49 AM 2019CH13477

concussion. The Plaintiffs heard from a coworker that the manager said that she would suspend anyone who mentioned the incident.

62.     Plaintiff Deshawn Bell saw customers assault employees on several occasions at the McDonald's restaurant at 111 West Madison in Oak Park. In approximately May 2018, July 2018, and September 2018, Bell saw customers came through an open counter into the work area and assault employees. In addition, two to three times per month, Bell saw customers throw food at employees.

63.     Plaintiff Adriana Alvarez has witnessed several verbal and physical attacks by customers on employees while working at the McDonald's restaurant at 2827 S. Cicero Ave. in Cicero, and she has heard from coworkers of other attacks. For example, on one occasion, an upset customer punched a cup holder stand in anger, causing it to fall on an employee. Approximately once per month, Alvarez has heard customers threaten employees by making statements such as, "I'll wait for you after work." Alvarez is also aware that a customer at her store pulled an employee's hair through the drive-thru window.

64.     Plaintiff Desirea Johnson has witnessed numerous physical attacks by customers on employees while working at the McDonald's restaurant at 2609 S. Kedzie Ave. in Chicago, a Corporate Store.

     a.     At least three times per week, Johnson has seen customers aggressively throw coffee, soda, or food at coworkers. On other occasions, Johnson has seen customers spit at coworkers, throw eggs at them, or shoot a paintball gun at a coworker.

18

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

b. Johnson has also seen a customer walk angrily into the work area behind the counter, yell at employees, and grab a bag of food that did not belong to him. Johnson ran to the back of the store because she feared that the customer had a gun.

c. Customers are regularly drunk or high in the store, and drug paraphernalia is found in the bathroom.

65. Plaintiff Diana Thomas has regularly witnessed violent and threating behavior by gang members while working at the McDonald's restaurant at 6900 S. Lafayette Ave. in Chicago.

a. On one occasion, Thomas witnessed a gang member throw a full container of soda at the manager. The container landed in hot grease used to make French fries, splattering grease everywhere.

b. Thomas has also witnessed a gang member spit on a coworker.

c. Thomas heard from a shift manager that a drunk man climbed through the drive-thru window, walked around the kitchen area, and yelled at employees. The man escaped by climbing back out the window.

d. Although the store previously employed an unarmed security guard, it stopped using the guard approximately a year ago. Afterwards, gang members began to appear more frequently in the store, typically congregating in groups, selling drugs and threatening employees.

66. Plaintiff Josefina Garduno was threatened with a gun while working at the McDonald's restaurant at Union Station in Chicago. In November 2019, a man stood near the entrance to the restaurant, pointed a gun at Garduno, and threatened to kill her. After

19

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

leaving briefly, the man returned, screamed at Garduno and other employees, and continued to threaten them. The man was eventually arrested, but Garduno was never interviewed by the restaurant's management about the incident. On other occasions, as well, Garduno has witnessed customers harassing or threatening co-workers.

67.     Plaintiffs Alvarez, Bailey, Ortega, Torres, Cervantes, DeLeon, Leyva, Vasquez, Garduno, Gonzalez, Johnson, Rivera, and Townsend continue to work at the McDonald's restaurants where they experienced violent and threatening behavior by customers. As a result, each of these Plaintiffs fears for their future safety.

**II.     McDonald's knows that violence is prevalent at the restaurants where Plaintiffs work and recognizes its obligation to address such violence.**

68.     McDonald's is liable for the harm suffered by Plaintiffs. As described in this section, McDonald's knows or should know that Plaintiffs and their coworkers face a significant risk of violence, and McDonald's has recognized its legal duty to prevent such violence. As described in Section III, McDonald's controls factors that have increased this risk of violence, often acting contrary to recommended best practices.

**A. McDonald's knows or should know that Plaintiffs and their coworkers face a significant risk of violence.**

69.     As noted above, roughly every 36 hours on average, American local news outlets deliver a new report on violence at a McDonald's restaurant. Such reports are common in the Chicago area. For example, in 2019, the Chicago media has reported that a person was shot and killed in a McDonald's restaurant and that a security guard at a McDonald's restaurant was assaulted.

70.     As also noted above, in the Chicago area, emergency service providers receive more than 20 calls per day, on average, from McDonald's restaurants.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

71.     The number of safety incidents, however, is likely much greater than these statistics indicate. As the U.S. Department of Justice has reported, the majority of violent crimes are never reported to the authorities. Indeed, as described in this Complaint, many Plaintiffs have witnessed incidents in which managers refused to report or refused to permit others to report incidents at the McDonald's restaurants where Plaintiffs work.

72.     McDonald's knows or should know of the frequent media reports of violence at McDonald's restaurants in the Chicago area and around the country.

73.     McDonald's knows or should know that crime and violence are significant risks for workers at businesses like McDonald's restaurants—those open late at night, in which workers interact directly with customers, and which are often located in high-crime areas.

74.     More than two decades ago, the National Institute for Occupational Safety and Health (NIOSH) published a report regarding "worker's risk for workplace assault." The report identified various "risk factors" present in McDonald's restaurants: "contact with the public," "exchange of money," "working late at night or during early morning hours," "working . . . in small numbers," and "working in high-crime areas." Excerpts from this report, printed from the NIOSH website, are attached as Exhibit A; see page 5.

75.     Similarly, more than a decade ago, the Occupational Safety and Health Administration (OSHA) reported that late-night restaurants posed a risk for workplace violence. Excerpts from an OSHA website for young workers at fast food restaurants, printed from the OSHA website, are attached as Exhibit B; see pages 3-7.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

**B. McDonald's has recognized its obligation to address crime and violence at franchise and corporate-owned restaurants.**

76.     The actions and statements of McDonald's show that, at the highest levels of the company, it recognizes the risk of crime and violence and acknowledges its own obligation to address the problem.

77.     McDonald's has created a corporate security branch that is tasked with overseeing security procedures for all McDonald's restaurants in the United States.

78.     On information and belief, the McDonald's security branch has established security procedures, such as standards for parking lot lighting and reporting of criminal activity at McDonald's restaurants, which it distributes to McDonald's restaurants.

79.     On information and belief, McDonald's monitors franchise restaurants' compliance with its security procedures by sending representatives to Franchise Stores.

80.     McDonald's has stated publicly that it has an obligation to protect workers at McDonald's restaurants from crime and violence.

81.     Rob Holm is the Senior Director of Safety and Security for the United States at Defendant McDonald's USA, LLC. In a joint interview with CAP Index President Jon Groussman, Holm stated, "our core responsibility is promoting a safe and secure work environment for employees and a place for customers for to visit . . . identifying the risk to our employees and to our customers, and then assessing that risk . . . [and] put[ing] programs and plans and processes and tools in place to mitigate the risk . . . [W]e all have that same . . . responsibilities to do that."

82.     In furtherance of that responsibility, Holm stated that McDonald's partnered with CAP Index to develop crime forecasting technology for use at all McDonald's restaurants.

22

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

83.    Likewise, in a public filing, McDonald's has stated "We are committed to providing a safe and healthful working environment for our employees. We require all employees to abide by safety rules and practices and to take the necessary precautions to protect themselves and their fellow employees. For everyone's safety, employees must immediately report accidents and unsafe practices or conditions to their immediate supervisors."

84.    Yet, as discussed below, McDonald's has failed to fulfill the duty to protect workers from violence that McDonald's acknowledges it has.

### C. Defendants have access to detailed information regarding crime and violence faced by Plaintiffs and their coworkers.

85.    McDonald's has centralized access at a national level to detailed information about crime at McDonald's restaurants in the United States and in their surrounding area.

86.    As noted above, McDonald's has publicly touted its partnership with CAP Index, a company specializing in crime risk assessment and reporting. CAP Index uses crime history data at particular geographic locations to create "CRIMECAST Reports" with "Cap Index Scores," which purport to identify crime risk at any location in the country.

87.    According to public statements by CAP Index, the company worked closely with McDonald's to develop the "Restaurant Risk Assessment Management Program" or "R 2 AMP." This "comprehensive program was designed to identify and track security risks as well as provide corrective measures to be considered at specific McDonald's locations."

88.    On information and belief, McDonald's developed the R 2 Amp system at the national level and used it to identify restaurants, including Franchise Stores, with elevated risks for violence. McDonald's then shared its data and the R 2 Amp system with Franchise Stores and utilized the data to implement its nationwide security policies.

23

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

89.     According to public statements by CAP Index, The R 2 AMP system allows McDonald's to :

    a.  Identify and rank security risks by using data such as geographic location, facility type, CAP Index Scores, and serious event history. CAP Index categorizes each McDonald's restaurant in low, medium, and high risk tiers.

    b.  Standardize incident response and reporting, and track data regarding serious incidents.

    c.  Use the collected data to monitor changes at each location, visualize trends, and adjust security allocations accordingly.

90.     Because of its access to R 2 AMP, McDonald's was or should have been aware that the store locations where Plaintiffs worked were in high-crime areas and thus faced a particular risk of crime and violence. In addition, the Franchisee Defendants should have been aware of crime levels at the restaurants they operate.

91.     Crime statistics for each McDonald's restaurant where Plaintiffs work or worked are provided below:

    a.  Between March and September 2019, police were called to respond to violent or potentially violent incidents 49 times at the McDonald's restaurant at 2609 S. Kedzie Ave. in Chicago, operated by Defendant McDonald's Restaurants of Illinois. Between March and August 2019 there were 264 criminal incidents within a 1/3 mile radius of the restaurant, 93 of which were "Part I" incidents and 171 of which were "Part II" incidents.[2]

---

[2]     Part I crimes are criminal homicide, forcible rape, robbery, aggravated assault, burglary, larceny, motor vehicle theft, and arson. Part II crimes are other assaults, forgery and counterfeiting, fraud, embezzlement, stolen property, vandalism, weapons offenses,

24

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

b. Between March and September 2019, police were called to respond to violent or potentially violent incidents 71 times at the McDonald's restaurant at 36 W. 95th St. in Chicago, operated by Defendant Nornat V. Between March and August 2019 there were 296 criminal incidents within a 1/3 mile radius of the restaurant, 103 of which were Part I incidents and 193 of which were Part II incidents.

c. Between March and September 2019, police were called to respond to violent or potentially violent incidents 29 times at the McDonald's restaurant at 1004 W. Wilson in Chicago, operated by Defendant Karavites Restaurant 5895. Between March and August 2019 there were 532 criminal incidents within a 1/3 mile radius of the restaurant, 240 of which were Part I incidents and 292 of which were Part II incidents.

d. Between March and September 2019, police were called to respond to violent or potentially violent incidents 30 times at the McDonald's restaurant at 1443 E. 87th St. in Chicago, operated by Defendant Brittlan V. Between March and August 2019 there were 177 criminal incidents within a 1/3 mile radius of the restaurant, 59 of which were Part I incidents and 118 of which were Part II incidents.

e. Between March and September 2019, police were called to respond to violent or potentially violent incidents 16 times at the McDonald's restaurant at 9560 S. Halstead St. in Chicago, operated by Defendant Brittlan V. Between

---

prostitution, other sex offenses, drug abuse violations, gambling, offenses against the family and children, driving under the influence, liquor law violations, drukenness, disorderly conduct, and vagrancy.

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

March and August 2019 there were 187 criminal incidents within a 1/3 mile radius of the restaurant, 58 of which were Part I incidents and 129 of which were Part II incidents.

f.   Between March and September 2019, police were called to respond to violent or potentially violent incidents 37 times at the McDonald's restaurant at 2425 E. 79th St. in Chicago, operated by Defendant Buena Vida. Between March and August 2019 there were 511 criminal incidents within a 1/3 mile radius of the restaurant, 184 of which were Part I incidents and 327 of which were Part II incidents.

g.   Between March and September 2019, police were called to respond to violent or potentially violent incidents 62 times at the McDonald's restaurant at 9211 S. Commercial in Chicago, operated by Defendant Nornat. Between March and August 2019 there were 224 criminal incidents within a 1/3 mile radius of the restaurant, 76 of which were Part I incidents and 148 of which were Part II incidents.

h.   Between March and September 2019, police were called to respond to violent or potentially violent incidents 35 times at the McDonald's restaurant at 180 W. Adams in Chicago, operated by Defendant RMC Adams-Wells. Between March and August 2019 there were 1,341 criminal incidents within a 1/3 mile radius of the restaurant, 718 of which were Part I incidents and 623 of which were Part II incidents.

i.   Between March and September 2019, police were called to respond to violent or potentially violent incidents 64 times at the McDonald's restaurant

26

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

at 6900 S. Lafayette Ave. in Chicago, operated by Defendant Nornat XI. Between March and August 2019 there were 438 criminal incidents within a 1/3 mile radius of the restaurant, 170 of which were Part I incidents and 268 of which were Part II incidents.

j.  Between March and September 2019, police were called to respond to violent or potentially violent incidents 71 times at the McDonald's restaurant at 5015 W. Madison in Chicago, operated by Defendant Omakin Restaurants. Between March and August 2019 there were 645 criminal incidents within a 1/3 mile radius of the restaurant, 203 of which were Part I incidents and 442 of which were Part II incidents.

k.  The McDonald's restaurant at Union Station in Chicago, operated by Defendant RMC Loop Enterprises, shares an address with other businesses, making it difficult to assess 911 call data. However, between March and August 2019 there were 563 criminal incidents within a 1/3 mile radius of the restaurant, 320 of which were Part I incidents and 243 of which were Part II incidents.

l.  Plaintiffs are seeking crime data for the McDonald's restaurant at 111 W. Madison in Oak Park.

m.  Plaintiffs are seeking crime data for the McDonald's restaurant at 2827 Cicero Ave. in Cicero.

27

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

III.    **McDonald's influences and controls factors that increase the risk of violence, including late-night hours, poor store design, lack of security training, and inadequate security policies.**

92.     McDonald's has repeatedly made decisions that undermine the safety and security of Plaintiffs and their co-workers. In general, these decisions are made by McDonald's, at the national corporate level, and implemented by the operators of McDonald's restaurants, who thus share liability.

93.     These decisions include the late-night hours of McDonald's restaurants; the unsafe physical design of McDonald's stores; the lack of adequate training for managers and line workers on safety and security issues; and the implementation of other inadequate security policies.

94.     In making decisions on these matters, Defendants have acted contrary to recommendations from experts for minimizing the risk of violence in the workplace.

95.     As shown below, McDonald's itself controls and influences these decisions. The actions of McDonald's show that it has chosen to prioritize profits over safety.

A.  **Overview of the McDonald's system**

96.     McDonald's develops, operates, maintains, franchises, and services a system of restaurants (the "McDonald's System").

97.     Under the McDonald's System, while franchisees conduct day-to-day operations, McDonald's retains substantial control over the location of McDonald's restaurants, their physical design, their operations, and their security-related practices and policies.

98.     McDonald's franchisees are required to enter into a franchise agreement with McDonald's. On information and belief, McDonald's enters into the same, or materially the

28

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

same, franchise agreement with each of its new franchises operating standalone stores within the United States.

99.     McDonald's generally grants franchisees a right to operate a McDonald's restaurant at a specific location for a specific period of time, usually 20 years.

100.     McDonald's controls the location of McDonald's restaurants. According to its public filings, McDonald's selects the site where each of its franchised restaurants will be located; franchisees do not select or approve those locations.

101.     McDonald's generally owns the property and buildings where McDonald's restaurants are located, and McDonald's charges rent to franchises.

102.     McDonald's is, in large part, a real estate company. According to a recent McDonald's public filing, rental income from franchisees accounted for about one-third of the company's total revenue last year and represents a growing part of its business. Since 2016, McDonald's' rental income increased by nearly $1 billion, to $7.1 billion in 2018.

103.     McDonald's also exercises substantial control over its franchises through the franchise agreement. On information and belief, the material terms of the standard franchise agreement include, without limitation:

> a.   a 20-year term;
>
> b.   the sole right of McDonald's, at its discretion, to renew or extend the Franchise Agreement at the end of the term;
>
> c.   no right of the franchisee to terminate the Agreement;
>
> d.   the right of McDonald's to terminate the Agreement for cause, including, among others, the failure to maintain the restaurant in

29

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

compliance with McDonald's standards, denial of access to

McDonald's, or any conduct that damages the McDonald's reputation;

e.   McDonald's right of first refusal to acquire the franchisee's business

by matching any offer; and

f.   prohibitions on the franchisee's involvement in competing or similar

business during the term of the franchise, and further prohibitions on

involvement in competing business within 10 miles for 18 months

after the termination or expiration of the franchise agreement.

104.   McDonald's provides franchisees with the McDonald's Operations and

Training Manual, which franchisees must use in operating their restaurants. The manual

mandates operational procedures, business practices and policies, bookkeeping and

accounting procedures, and methods of inventory control, among other things.

105.   According to its public filings, to ensure uniformity, McDonald's requires its

franchisees to use only equipment that meets standards established by McDonald's.

Further, McDonald's franchisees must purchase that equipment either directly from

McDonald's or from McDonald's-approved suppliers.

106.   According to its public filings, McDonald's generates substantial revenue by

charging its franchised restaurants a variety of fees, in addition to rent, including a monthly

service fee equivalent to 4% of gross sales revenues and fees for advertising of at least 4%

of gross sales, payable to local advertising cooperatives and McDonald's national

advertising fund, along with various other fees.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

**B.  Starting in 2003, McDonald's transformed its system into a late-night business, increasing the risk of violence.**

107.    Prior to 2003, fewer than one percent of McDonald's restaurants were open 24 hours a day. Meanwhile, the profits of McDonald's Corporation were stagnant. The financial growth of the company had, to that point, been fueled largely by an increasing number of store locations. But that strategy was no longer driving significant increases in profits. Consequently, McDonald's chose to focus on increasing profits at existing store locations by extending their hours.

108.    Starting in 2003, McDonald's began requiring and encouraging franchises to stay open later. In the following years, more than 90 percent of McDonald's restaurants in the United States extended their hours, and around 40% of McDonald's restaurants in the United States moved to 24-hours per day service.

109.    According to its model franchise agreement, McDonald's requires franchises to "[o]perate the Restaurant seven (7) days per week throughout the year and at least during the hours from 7:00 a.m. to 11:00 p.m., or such other hours as may from time to time be prescribed by McDonald's."

110.    In Chicago, approximately 70% of McDonald's restaurants are open 24 hours a day. Among the stores at which Plaintiffs work or worked, most are open 24 hours a day, and all but one are open at least 20 hours a day. The sole exception is the restaurant in the McDonald's global headquarters at 1035 W. Randolph St. in Chicago, which is open 16 hours a day.

111.    McDonald's restaurants are open later, on average, than other fast food restaurants. According to a study by the National Employment Law Project, McDonald's

31

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

restaurants are open an average of 20 hours and 52 minutes per day. These hours are substantially longer than McDonald's competitors, such as Taco Bell (18:10), Burger King (17:48), Sonic (16:52), Chick Fil A (14:57), and Wendy's (14:20).

112.    The McDonald's national push for late-night hours fulfilled its purpose of increasing profits. The profits of McDonald's Corporation rose steadily in the years after 2003, and McDonald's executives attributed this increase to late-night operation.

113.    However, late-night operation comes with a downside: it substantially increases the risk of crime and violence. It is well established that the risk of violence and crime in businesses rises dramatically during late-night hours. For example, NIOSH has recognized that "[w]orking late at night or during early morning hours" is a risk factor for workplace assault. *See* Exhibit A, at 5.

**C.  McDonald's controls the design of stores but has defied best practices for preventing violence through physical design.**

114.    Given its push for 24-hour operation, McDonald's should have closely studied and followed expert recommendations for the safe operation of a late-night business. But McDonald's has instead done the opposite, defying well-established best practices.

115.    Many of these best practices relate to the physical design of stores. For decades, criminologists have researched how the physical design of a space, including a business, can either facilitate crime or reduce the risk of crime. They have recommended, among other things, solid physical separation between workers and customers as well as designs that maximize visibility. These recommendations and others are discussed below.

116.    The physical design of stores is squarely within the control of McDonald's.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

117.     Through its national department known as US Restaurant Design and the architects and engineers employed in that department, McDonald's oversees the design of McDonald's restaurants. McDonald's also has Regional Construction Departments that administer construction and renovation of McDonald's restaurants around the country.

118.     McDonald's publishes a "Project Manual" that serves as a guide to contractors building and renovating McDonald's restaurants. On information and belief, all McDonald's restaurants must adhere to the McDonald's guidelines for restaurant design, including the Project Manual, or McDonald's may withdraw their right to operate.

119.     The Project Manual is nearly 900 pages long. It provides contractors with standards for virtually every aspect of store construction, including requirements for materials and product models. The project manual contains requirements for nearly everything about the physical structure of the restaurant and the fixtures inside.

120.     When building or remodeling a store, McDonald's hires a local engineering or architecture firm that designs the stores based on McDonald's specifications in the Project Manual. Store designs drafted by engineering/architecture firms are submitted to McDonald's for review and approval.

121.     As part of the franchising agreement, McDonald's requires that franchisees keep the store constructed and equipped in accordance with the building blueprints and equipment layout plans approved by McDonald's and does not allow franchisees to make any alterations, conversions, or additions to the building, equipment, or parking area without prior consent from McDonald's.

122.     The Project Manual contains requirements for several design issues affecting employee safety, including counters and drive-thru windows.

33

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

123.    Materials used in constructing restaurants are purchased by McDonald's itself, based on McDonald's specifications.

124.    In 2017, McDonald's announced a nationwide effort to physically redesign most McDonald's restaurants. This effort was called "Experience of the Future" or "EOTF."

125.    As with prior restaurant designs, McDonald's set strict design standards for franchise restaurants remodeling in accordance with EOTF. McDonald's also provided franchisees with financial incentives to convert and remodel restaurants quickly. Specifically, McDonald's agreed to cover 55 percent of the remodeling costs for franchises that complete the remodels through 2020.

126.    According to public filings, in 2018, approximately 4,500 McDonald's restaurants in the United States were converted to EOTF, resulting in over half of U.S. McDonald's currently having EOTF.  McDonald's expects to convert substantially all of the restaurants in the U.S. to EOTF by the end of 2020.

127.    Despite its substantial control over store design, McDonald's has ignored recommended best practices for the safe design of late-night businesses, as we now discuss.

### i. Physical barriers between workers and customers

128.    One of the most basic and well-established safety recommendations for late-night businesses is to ensure "physical separation of workers from customers," according to a 1996 NIOSH report. In other words, agitated customers and others who intend to commit crimes should not have direct access to workers. See Exhibit A, at 6.

34

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

129.    Within a fast food restaurant, the main physical barrier between workers and customers is the check-out counter. Cashiers and kitchen staff work behind the counter, and customers should remain in front of the counter. A customer who gets behind the counter will not only have direct access to workers but also to knives, pots, hot oil, and other items that can be used to cause significant bodily harm to workers.

130.    Experts have advised that late-night businesses should design counters to serve as a protective barriers as an "important consideration[] in protecting workers." *See* Exhibit A, at 6; Exhibit C, at 9.

131.    McDonald's, however, has taken the opposite approach. Rather than ensure strong barriers between workers and customers, McDonald's has actively sought to lessen and remove such barriers, thereby exposing workers to a significant risk of violence.

132.    First, McDonald's has put counters in its stores that have large gaps providing any customer easy access to workers and the kitchen area. These are known as "split counters."

133.    Split counters are included in many Experience of the Future store designs. While previous McDonald's counter designs called for a long serving counter separating employees and customers, EOTF calls for separate serving stations for in-restaurant and mobile orders with empty walking space between the two counters. The passageway permits unobstructed access to the cash registers and kitchen by non-employees in the restaurant.

134.    Plaintiffs Alvarez, Bailey, Bell, Cervantes, DeLeon, Vasquez, Gonzalez, Johnson, and Leyva work at McDonald's restaurants with split counters. These stores are operated by Defendants Jokat Co., Inc., Brittlan V, LLC, Nelson Enterprises, Inc., RMC

35

FILED DATE: 11/21/2019 7:49 AM 2019CH3477

Adams-Wells, LLC, and Karavites Restaurant 5895, Inc., and McDonald's Restaurants of Illinois, Inc.

135. As described above, Plaintiffs DeLeon, Leyva, Vasquez, Bell, and Johnson experienced incidents in which customers committed threatening or violent acts after gaining access to the area behind the counter. These incidents were caused directly by the use of split counters.

136. Aside from split counters, McDonald's has also used counters that are relatively low to the ground, making it easier for a customer to climb over the counter into the kitchen area. This, again, puts workers at risk.

137. Plaintiffs Bailey, Carbajal, Ortega, and Torres work at McDonald's restaurants with lowered counters. These stores are operated by Defendants Brittlan V, LLC and Nornat V, Inc.

138. As described above, Plaintiffs Carbajal, Ortega, and Torres experienced incidents in which customers jumped over lowered counters and committed violent or threatening acts. These incidents were caused directly by the use of lowered counters.

139. Physical separation is also important in dealing with drive-thru customers.

140. To minimize risk to employees serving drive-thru customers, drive-thru windows should be designed to prevent customers from gaining access to employees or being able to enter the store through the window.

141. For example, windows should utilize drawers that can be used to exchange money or items without allowing direct contact between workers and employees. Windows should also have strong locks. Other important factors include the windows' size and placement (e.g., how close to the ground they are). *See* Exhibit B at 7; Exhibit C, at 9.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

142.    In spite of recommendations from security experts, McDonald's restaurants often utilize drive-thru windows that do not provide adequate protection to workers. For example, even in high crime area, many stores do not utilize drawers that would allow workers to avoid direct contact with customers.

143.    Plaintiffs Bailey, Carbajal, Gonzalez, Ortega, Torres, and Townsend work at McDonald's restaurants with insecure drive-thru windows. These stores are operated by Defendants Brittlan V, LLC, Nornat V, Inc., Karavites Restaurant 5895, Inc., and Buena Vida, LLC.

144.    As described above, Plaintiffs Bailey and Townsend experienced incidents in which customers committed violent acts through drive-thru windows. These incidents were directly caused by the use of insecure drive-thru windows.

### ii. Visibility

145.    Another critical recommendation for the design of late-night businesses is to ensure high visibility into and out of areas in which assaults might take place.

146.    High visibility protects workers by ensuring that any security incidents can be easily seen and responded to by other employees, customers, and law enforcement. It also allows workers to identify threats before they arise.

147.    Criminologists have emphasized the importance of "natural surveillance" or "surveillance through physical design," meaning that businesses should utilize "physical design mechanisms that serve to increase the risk of detection for offenders, enable evasive actions by potential victims, and facilitate intervention by police." Lawrence J. Fennelly & Timothy Crowe, Crime Prevention Through Environmental Design 130 (3d. Ed. 2013).

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

148.     For example, experts advise late-night businesses to "[e]nsur[e] the customer service and cash register areas are visible from outside the establishment." *See* Exhibit C, at 9.

149.     Accordingly, late-night businesses are advised to avoid placing signage in the windows that would impair visibility. Businesses should "[l]imit[] window signs to low or high locations . . . so that workers can see incoming customers and so that police can observe what is occurring from the outside of the store." *See* Exhibit C, at 9. Similarly, the Indiana Department of Labor has recommended "removing large posters or product displays from windows." *See* Exhibit D, at 12.

150.     Likewise, within a store, check-out counters should be located in places where they can be seen easily by other employees and customers, and where workers at the counters can see places that entail an elevated risk of violence, such as bathrooms.

151.     As with physical barriers between workers and customers, McDonald's has disregarded these security recommendations. For example, the windows at McDonald's restaurants are often covered with advertising posters, thereby eliminating adequate visibility. As a result, workers are forced to interact with customers in low-visibility areas, exposing them to heightened risk of violence.

152.     Plaintiffs Bailey, Cervantes, DeLeon, Vasquez, Gonzalez, Leyva, Rivera, and Townsend work at McDonald's restaurants in which visibility was impaired. These stores are operated by Defendants Brittlan V, LLC, HQ 39148, LLC, RMC Adams-Wells, LLC, Karavites Restaurant 5895, Inc., Nornat, Inc., and Buena Vida, LLC. As described above, these Plaintiffs experienced violent incidents at work, which were caused by the unsafe environment created by Defendants' actions.

38

FILED DATE: 11/21/2019 7:48 AM   2019CH13477

### iii. Bathrooms

153.    Bathrooms are a particularly high-risk area. Criminologists have long recognized that restrooms are common sites for illegal and illicit activity.

154.    McDonald's has not followed best practices for security related to bathrooms. For example, bathrooms at McDonald's restaurants where Plaintiffs work are not visible to workers at the counter, thereby increasing the risk of violent incidents. In addition, when Plaintiffs clean bathrooms, they are not permitted to lock the bathroom doors.

155.    Plaintiffs Cervantes, Gonzalez, and Rivera have been assaulted in bathrooms. These stores are operated by Defendants HQ 39148, LLC, Karavites Restaurant 5895, Inc. and Nornat, Inc.

### D. McDonald's controls employee training and has failed to provide adequate safety and security training.

156.    Aside from physical design, one of the most important steps that a business should take to protect its workers is providing adequate training to the workers and their managers.

157.    NIOSH has deemed training "critical" to protect workers from workplace assault. *See* Exhibit A, at 6-7. Experts have developed detailed recommendations for training, as discussed below.

158.    McDonald's substantially controls training for the workers at McDonald's restaurants.

159.    McDonald's operates Hamburger University, the training center for the worldwide McDonald's System.

160.    McDonald's trains franchisee owners and operators on a basic curriculum, known as the Restaurant Department Management curriculum. On information and belief,

39

franchisee owners and operators must complete the Restaurant Department Management curriculum to be qualified to operate a McDonald's restaurant.

161.    McDonald's also requires each franchised restaurant to have at least one General Manager who has completed training at Hamburger University.

162.    Employees at McDonald's restaurants have to complete training provided by McDonald's to be promoted to a crew trainer, shift manager, or first assistant manager.

163.    McDonald's also provides training materials for all workers to use in McDonald's restaurants.

164.    However, on information and belief, as of August 2019, McDonald's implemented no nationwide training programs on workplace violence, conflict resolution, de-escalation techniques, or other techniques that could be useful in the event of a store robbery or a customer engaging in erratic or violent conduct.

165.    In failing to provide safety and security training, McDonald's has defied best practices recommended by experts, who have emphasized the importance of training that teaches workers about, among other things, the specific risks posed by a particular work site; how to reduce risk, recognize a potentially dangerous situation, de-escalate conflict, and respond to crime; and how to follow the business's violence prevention policies.

166.    Experts have further recommended that training be delivered at least annually to all workers (including part time and temporary workers) by a qualified trainer. It should include role-playing, simulations, and drills. The training should be formally evaluated on a regular basis, at least annually, to ensure its effectiveness.

167.    McDonald's does not follow these recommendations. As a result, Plaintiffs have received no training compliant with the recommendations set forth above.

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

FILED DATE: 11/21/2019 7:49 AM  2019CH13477

168.    On information and belief, Plaintiffs' managers have also received no or little relevant training, as illustrated by managers' grossly deficient response to security incidents experienced by Plaintiffs, discussed above.

169.    McDonald's recognized its systemic failure to provide violence-prevention training when it announced in August 2019 that it would introduce such training. McDonald's claimed in its announcement that training would start in October 2019.

170.    However, as of the filing of this Complaint, Plaintiffs have received no training that complies with the minimum standards for safety and security training set forth above.

**E.  Defendants have adopted other policies and practices that increase the risk of violence.**

171.    Aside from late-night hours, poor physical design, and inadequate training, Defendants have adopted other policies and practices that put Plaintiffs at risk.

172.    For example, late-night businesses have long been advised to adopt cash management policies that ensure that employees will have restricted access to cash and to display prominent signage that informs customers of these policies.

173.    Appropriate cash handling policies are considered one of the best way to reduce robberies.

174.    Defendants do not consistently follow recommendations for cash handling. For example, Plaintiffs have observed cash reserves of over $1,000 kept in registers.

175.    Many of Plaintiffs' stores do not inform customers that the stores limit workers' access to cash.

41

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

176. Second, experts recommend that businesses maintain a policy of calling law enforcement whenever security incidents occur. However, at least some Plaintiffs have experienced incidents in which managers reused to call the police or specifically discouraged workers from calling the police.

    a. When Plaintiff Gonzalez was verbally and physically assaulted by a customer who hit her with a "Wet Floor" sign, the shift manager did not call the police. The store manager later told Gonzalez that he would call the police if the customer returned, but the customer did return on several occasions, and the manager refused to call the police.

    b. When a customer threw items at workers in Plaintiff Carbajal's store, the manager responded by throwing items back at the customer, but did not call the police.

    c. A manager told Plaintiff Cervantes that someone had called and said he would kill everyone in the store, but the manager did not inform the police. This occurred approximately thirty minutes after Cervantes was followed and verbally assaulted by a person in the store.

177. Upon information and belief, Defendants fail to implement other recommended practices for preventing crime and violence against workers, or directly defy those recommendations. These other recommendations include: installing panic buttons and informing all workers of how and when to use them; installing and regularly monitoring camera feeds showing activity inside and around the store; having adequate staff, including security guards, in place at appropriate times; and installing elements such

as speed bumps and other pavement modifiers that make it harder to quickly enter and leave the store premises.

**CAUSES OF ACTION**

**Count One: Claim by all Plaintiffs for Negligence Against McDonald's Corporation and McDonald's USA**
**(Direct Liability)**

178.    Plaintiffs hereby incorporate by reference the allegations in each of the above paragraphs.

Duty

179.    McDonald's voluntarily assumed a duty of care to Plaintiffs with respect to security issues. As reflected in its public statements, McDonald's has recognized the risk of violence faced by workers at McDonald's restaurants and has acknowledged the importance of security. Consequently, it established a corporate office charged with security oversight of all McDonald's restaurants in the United States, established security protocol and procedures for those restaurants; partnered with CAP Index to establish the R 2 AMP system, and used the system to manage security at all the restaurants in the McDonald's System.

180.    McDonald's has acknowledged in public statements that it has a duty to protect workers from crime and violence.

181.    Aside from its assumed duty to protect workers from crime and violence, McDonald's has a duty as a landowner and landlord in light of its control over certain property elements. For example, through its lease agreements with franchisees,

43

FILED DATE: 11/21/2019 7:49 AM 2019CH13477

McDonald's restricts the franchisees' use of the land, including restricting environmental design changes to the property.

182.     McDonald's also owed a duty of care to Plaintiff Desirea Johnson because McDonald's, through its wholly-owned subsidiary McDonald's Restaurants of Illinois, is the owner and operator of the Corporate Stores where she worked.

Breach

183.     McDonald's breached its duty to Plaintiffs when it took the actions described above in Section III of the Factual Allegations, which unreasonably exposed Plaintiffs to an elevated risk of crime and violence. Specifically:

    a.  McDonald's imposed late night hours at the stores where Plaintiffs worked, without implementing adequate store design, employee training, or security policies.

    b.  As to store design, McDonald's ignored expert recommendations and research regarding barriers between workers and customers.

    c.  McDonald's acted negligently with respect to the design and placement of bathrooms, and policies regarding bathrooms.

    d.  McDonald's acted negligently with respect to other elements causing an unsafe environment, including lack of visibility, non-existent or inadequate training, and unsafe store policies.

184.     The cost to McDonald's of following recommended practices with respect to store design, employee training, and security policies would be far exceeded by the benefits of doing so in terms of preventing harm to workers.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

Causation

185.   The actions of McDonald's created an unsafe environment in the stores in which Plaintiffs worked, which in turn permitted each of the incidents of violence described in this complaint.

186.   As to store design, the absence of a strong barrier between workers and customers caused incidents of violence described in paragraphs 56, 58, 59, 60, 61, 62, 63, 64, and 65.

187.   The negligence of McDonald's with respect to bathrooms caused the incidents of violence described in paragraphs 54, 55, and 57.

188.   McDonald's also acted negligently with respect to other elements creating an unsafe environment, including lack of visibility, non-existent or inadequate training, and unsafe store policies. This unsafe environment caused all of the incidents described in this complaint.

189.   McDonald's breach of duty was the in-fact and proximate cause of Plaintiffs' injuries.

190.   Plaintiffs' injuries were foreseeable to McDonald's due to its detailed knowledge of crime statistics and incidents of violence at all McDonald's restaurants. McDonald's specifically was aware that the stores where Plaintiffs worked were located in high-crime areas, as discussed in paragraphs 85 to 91.

Injury

191.   Plaintiffs suffered significant injuries resulting from the negligence of McDonald's.

45

FILED DATE: 11/21/2019 7:49 AM   2018CH13477

192.    Gonzalez suffered injuries when customers assaulted her on two separate occasions. One customer hit her with a "Wet Floor" sign, causing pain in her neck and back that continue to this day. Another customer groped her.

193.    Rivera suffered injuries when customers assaulted her on two separate occasions. One customer urinated on her and another put his hand down her shirt.

194.    Bailey suffered injury when a customer assaulted her by throwing a sandwich at her.

195.    Cervantes suffered injuries when customers exposed themselves to her and threatened her.

196.    Acuña suffered injury when a customer pepper sprayed an employee, causing her difficulty breathing.

197.    Carbajal, Ortega, Torres, Townsend, DeLeon, Leyva, Vasquez, Bell, Thomas, Johnson, and Alvarez suffered injuries when they witnessed acts of violence against their coworkers.

198.    Plaintiffs seek damages as well as injunctive relief to remedy their injuries.

199.    Plaintiffs have a clear and ascertainable right to be free from injuries resulting from the negligence of McDonald's.

200.    If injunctive relief is not granted, Plaintiffs face a significant risk of irreparable harm in the form of physical and emotional injuries from continuing acts of violence. Indeed, Plaintiffs are vulnerable to severe bodily injury or death from the unsafe environment in which they work. Such injuries cannot be compensated adequately by damages.

46

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

201.    Plaintiffs face a constant and continuing risk of violence due to the negligence of McDonald's.

202.    Such injuries cannot be adequately remedied at law through a damages claim.

203.    The risk of injury faced by Plaintiffs outweighs the cost of the reasonable measures included in Plaintiffs' proposed injunction.

Wherefore, Plaintiffs seek the following relief from Defendants McDonald's Corporation and McDonald's USA:

a.  An injunction that requires them to:

    i.   Make modifications to restaurant designs, including removal of split counters, changes to drive thru widows, and changes in the design and placement of restrooms.

    ii.  Implement adequate cash handling policies.

    iii. Implement adequate safety and security training.

    iv.  Implement any other policies necessary to protect Plaintiffs from violence at work.

    v.   Cease and desist from requiring and encouraging franchise restaurants to implement split counter designs or lowered counters.

    vi.  Cease and desist from requiring and encouraging franchise restaurants to place advertisements on restaurant windows that obstruct employees' view of customers entering the restaurant, visibility into the restaurants from the outside, or both.

47

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

vii.   Cease and desist from requiring and encouraging franchise

restaurants to be open at late-night hours without adequate safety

procedures and security.

viii.   Cease and desist from implementing any other policies that

negligently expose Plaintiffs to a risk of violence.

b.   Damages in excess of $50,000 for each Plaintiff.

c.   Any other relief the Court finds just and appropriate.

**Count Two: Claim by all Plaintiffs for Negligence Against McDonald's Corporation and McDonald's USA**
**(Vicarious Liability)**

204.   Plaintiffs hereby incorporate by reference the allegations in each of the above

paragraphs.

205.   McDonald's is vicariously liable for the negligence of the operators of the

stores where Plaintiffs worked.

206.   McDonald's and the store operators have a principal-agent relationship with

respect to store design and security-related policies. Specifically, McDonald's controls store

design and security-related policies, while franchise owners, pursuant to agreements with

McDonald's, implement design and security-related policies.

207.   For example, McDonald's controls the design of stores through the Project

Manual and its design and construction requirements, as described above in Paragraphs

116 to 126. To the extent franchise owners participate in store design and construction,

they do so as agents of McDonald's. Further, McDonald's controls employee training and

other relevant security policies. To the extent franchise owners participate in the

implementation of these policies, they do so as agents of McDonald's.

48

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

208.   Alternatively, McDonald's is vicariously liable under the apparent agency doctrine because Plaintiffs reasonably assumed that a principal-agent relationship existed with respect to safety and security issues. Plaintiffs' assumption arose from, among other things, McDonald's implementation of national security policies applying to Plaintiffs, and the fact that Plaintiffs worked in McDonald's stores and in uniforms labeled with the McDonald's name and logo. A reasonable worker would assume that McDonald's was responsible for security protocols at the franchise restaurant where Plaintiffs worked. Plaintiffs relied on this assumption.

209.   The operators of the stores where Plaintiffs work or worked (*i.e.,* the Franchisee Defendants and McDonald's Restaurants of Illinois) are liable as set forth in Counts Three and Four below for their participation in and implementation of unsafe security policies. McDonald's is vicariously liable for those violations.

Wherefore, Plaintiffs seek the following relief from Defendants McDonald's Corporation and McDonald's USA:

    a.   An injunction that requires them to:

        i.   Make modifications to restaurant designs, including removal of split counters, changes to drive thru widows, and changes in the design and placement of restrooms.

        ii.   Implement adequate cash handling policies.

        iii.   Implement adequate safety and security training.

        iv.   Implement any other policies necessary to protect Plaintiffs from violence at work.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

    v.   Cease and desist from requiring and encouraging franchise restaurants to implement split counter designs or lowered counters.

    vi.   Cease and desist from requiring and encouraging franchise restaurants to place advertisements on restaurant windows that obstruct employees' view of customers entering the restaurant, visibility into the restaurants from the outside, or both.

    vii.   Cease and desist from requiring and encouraging franchise restaurants to be open at late-night hours without adequate safety procedures and security.

    viii.   Cease and desist from implementing any other policies that negligently expose Plaintiffs to a risk of violence.

  b.  Damages in excess of $50,000 for each Plaintiff.

  c.  Any other relief the Court finds just and appropriate.

### Count Three: Claim by Plaintiff Johnson for Negligence Against McDonald's Restaurants of Illinois

210.    Plaintiffs hereby incorporate by reference the allegations in each of the above paragraphs.

<u>Duty</u>

211.    McDonald's Restaurants of Illinois owns and operates the store where Plaintiff Johnson works.

212.    As a business invitor, land possessor, and employer, McDonald's Restaurants of Illinois has a duty to protect its workers from crime and violence.

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

Breach

213.    McDonald's Restaurants of Illinois breached its duty to Johnson when it implemented store design elements and policies mandated by McDonald's, as set forth in Section III of the Factual Allegations above.

Causation

214.    As a result of this breach of duty, Johnson suffered injuries. For example, the store design elements implemented by McDonald's Restaurants of Illinois permitted a customer to walk angrily into the work area behind the counter and threaten Johnson and other workers. Further, the restaurant's design and policies created an unsafe environment that permitted the incidents of crime and violence experienced by Johnson.

215.    McDonald's Restaurants of Illinois's breach of duty was the in-fact and proximate cause of Johnson's injuries.

216.    Johnson's injuries were foreseeable to McDonald's Restaurants of Illinois due to its knowledge of crime levels near its stores and incidents of violence at its stores.

Injury

217.    Johnson suffered injury when she witnessed violent assaults against her coworkers.

218.    Johnson does not seek damages from McDonald's Restaurants of Illinois, which is her direct employer. However, Johnson seeks injunctive relief from McDonald's Restaurants of Illinois.

219.    Johnson has a clear and ascertainable right to be free from injuries resulting from the negligence of McDonald's Restaurants of Illinois.

51

FILED DATE: 11/21/2019 7:49 AM    2019CH13477

220.    If injunctive relief is not granted, Johnson faces a significant risk of irreparable harm in the form of physical and emotional injuries from continuing acts of violence. Indeed, Johnson is vulnerable to severe bodily injury or death from the unsafe environment in which she works. Such injuries cannot be compensated adequately by damages.

221.    Johnson faces a constant and continuing risk of violence due to the negligence of McDonald's Restaurants of Illinois. Such injuries cannot be remedied at law through a damages claim.

222.    The risk of injury faced by Johnson outweighs the cost of the reasonable measures included in the proposed injunction.

Wherefore, Plaintiff Johnson seeks the following relief from Defendant McDonald's Restaurants of Illinois:

a.    An injunction against McDonald's Restaurants of Illinois that requires it to:

    i.    Make modifications to restaurant designs, including removal of split counters, changes to drive thru widows, and changes in the design and placement of restrooms.

    ii.    Implement adequate cash handling policies.

    iii.    Implement adequate safety and security training.

    iv.    Implement any other policies necessary to protect Plaintiffs from violence at work.

52

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

v.   Cease and desist from placing advertisements on restaurant windows that obstruct employees' view of customers entering the restaurant, visibility into the restaurants from the outside, or both.

vi.   Cease and desist from late-night operation without adequate safety procedures and security.

vii.   Cease and desist from implementing any other policies that negligently expose Johnson to a risk of violence.

b.   Any other relief the Court finds just and appropriate.

**Count Four: Claim by Plaintiffs Alvarez, Bailey, Ortega, Torres, Cervantes, DeLeon, Leyva, Vasquez, Garduno, Gonzalez, Johnson, Rivera, and Townsend for Negligence Against Franchisee Defendants**

223.   Plaintiffs hereby incorporate by reference the allegations in each of the above paragraphs.

224.   The Franchisee Defendants own and operate the stores where Plaintiffs Alvarez, Bailey, Ortega, Torres, Cervantes, DeLeon, Leyva, Vasquez, Garduno, Gonzalez, Johnson, Rivera, and Townsend work. The Franchisee Defendants are the employers of those Plaintiffs.

225.   Each of these Plaintiffs pursues a claim of negligence against the Franchisee Defendant that employs the Plaintiff.

<u>Duty</u>

226.   As a business invitor, land possessor, and employer, each Franchisee Defendant had a duty to protect its workers from crime and violence.

53

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

Breach

227.    The Franchisee Defendants breached their duty to Plaintiffs when they implemented store design elements and policies mandated by McDonald's, as set forth in Section III of the Factual Allegations above.

Causation

228.    As a result of this breach of duty, Plaintiffs suffered injuries, as set forth in paragraphs 186 to 190 above.

229.    The Franchisee Defendants' breach of duty was the in-fact and proximate cause of Plaintiffs' injuries.

230.    Plaintiffs' injuries were foreseeable to each Franchisee Defendant due to its knowledge of crime levels near its stores and incidents of violence at its store.

Injury

231.    Plaintiffs suffered injuries as set forth in paragraphs 192 to 197 above.

232.    Plaintiffs seek no damages from the Franchisee Defendants. Rather, Plaintiffs seeks injunctive relief from the Franchisee Defendants.

233.    Plaintiffs have a clear and ascertainable right to be free from injuries resulting from the negligence of the Franchisee Defendants.

234.    If injunctive relief is not granted, Plaintiffs face a significant risk of irreparable harm in the form of physical and emotional injuries from continuing acts of violence. Indeed, Plaintiffs are vulnerable to severe bodily injury or death from the unsafe environment in which they work. Such injuries cannot be compensated adequately by damages.

54

FILED DATE: 11/21/2019 7:49 AM   2019CH13477

235.    Plaintiffs face a constant and continuing risk of violence due to the negligence of the Franchisee Defendants.

236.    Such injuries cannot be remedied at law through a damages claim.

237.    The risk of injury faced by Plaintiffs outweighs the cost of the reasonable measures included in the proposed injunction.

Wherefore, each of the Plaintiffs identified in paragraph 224 seeks the following relief from the Franchisee Defendant that employs the Plaintiff:

    c.    An injunction against that Defendant requiring it to:

        i.    Make modifications to restaurant designs, including removal of split counters, changes to drive thru widows, and changes in the design and placement of restrooms.

        ii.    Implement adequate cash handling policies.

        iii.    Implement adequate safety and security training.

        iv.    Implement any other policies necessary to protect Plaintiffs from violence at work.

        v.    Cease and desist from placing advertisements on restaurant windows that obstruct employees' view of customers entering the restaurant, visibility into the restaurants from the outside, or both.

        vi.    Cease and desist from late-night operation without adequate safety procedures and security.

        vii.    Cease and desist from implementing any other policies that negligently expose Johnson to a risk of violence.

d.  Any other relief the Court finds just and appropriate.

## JURY DEMAND

Plaintiffs demand a jury for all issues triable by a jury.

Respectfully submitted,

Sonia Acuña, Adriana Alvarez, Lakara Bailey, Deshawn Bell, Brenda Carbajal, Teresa Cervantes, Carlos DeLeon, Josefina Garduno, Elvira Gonzalez, Desirea Johnson, Yolanda Leyva, Martina Ortega, Graciela Rivera, Diana Thomas, Maria Torres, Ieshia Townsend, and Reyna Vazquez

Dated:  November 21, 2019

By:  Barry M. Bennett
     One of Plaintiffs' Attorneys

Barry M. Bennett
George A. Luscombe III
Stephen A. Yokich
DOWD, BLOCH, BENNETT,
   CERVONE, AUERBACH & YOKICH
8 South Michigan Avenue, 19th Floor
Chicago, Illinois 60603
Tel: (312) 372-1361
Fax: (312) 372-6599
Email: bbennett@laboradvocates.com
Firm I.D. Number: 12929

David H. Seligman*
1535 High St.
Denver, CO, 80218
Tel: (720) 248-8426
Email: david@towardsjustice.org

*Registration under Rule 707 pending.

David P. Dean*
Daniel M. Rosenthal*
Ryan E. Griffin*
Michael P. Ellement*
JAMES & HOFFMAN, P.C.
1130 Connecticut Ave. NW, Suite 950
Washington, DC 20036
Tel: (202) 496-0500
Fax: (202) 496-0555
Email: dmrosenthal@jamhoff.com

FILED DATE: 11/21/2019 7:49 AM   2019CH13477



**McDonald's**

McDonald's Corporation
110 N. Carpenter St.
Chicago, Illinois 60607
Direct Dial Number: (630) 630-5392
Email Address: pauline.levy@us.mcd.com

March 5, 2020

**VIA FEDERAL EXPRESS**

OneBeacon Insurance Group
Homeland Insurance Company of New York
Attn: Claims Department
1000 Woodbury Road, Suite 403
Woodbury, NY 11797

Re:     **Insureds: Lofton & Lofton Management Inc. and McDonald's
        (relevant location) Corporation (5015 W. Madison St., Chicago)
        Policy Nos.: 619-00-00-39-0001
        Policy Terms: March 1, 2016 to March 1, 2017**

Dear Sir/Madam:

Enclosed please find a lawsuit filed on or about November 21, 2019, against, among others, McDonald's Corporation ("McDonald's"), captioned *Sonia Acuña, et al. v. McDonald's Corporation, et al.*, Case No. 2019 CH 13477, in the Circuit Court of Cook County, Illinois, Chancery Division (the "Acuña Lawsuit"), which we provide in accordance with the policy terms calling for the provision of notice of a claim or "suit" brought against McDonald's. McDonald's requests that OneBeacon Insurance Group ("OneBeacon") acknowledge and undertake all insuring obligations under any and all applicable policies issued by OneBeacon, including but not limited to its duties to defend and indemnify McDonald's against the Acuña Lawsuit.

McDonald's has retained Elizabeth McRee of Jones Day to serve as defense counsel in the Acuña Lawsuit. The significantly-discounted rates agreed upon for Ms. McRee and her staff are as follows: Ms. McRee - $900/hour; Bethany Biesenthal - $825/hour; Ann-Marie Woods - $600/hour; and Darrius Atkins - $450/hour. Accordingly, please confirm your approval of Jones Day's representation and your agreement to

EXHIBIT B

OneBeacon Insurance Group
March 5, 2020
Page 2

contribute toward the defense fees and costs incurred in connection with the same. We suggest that we set up a call to further discuss the specifics of the defense and its funding.

*This claim is being reported under any and all applicable policies issued by OneBeacon, whether or not cited above.* Please acknowledge receipt of this notice to the undersigned and provide the name and email address of the individual assigned to this matter.

If you require further information, please contact me.

Sincerely,

Pauline Levy
Senior Counsel
McDonald's Corporation

Enc.

cc (via email only):

Andrew A. Boros (andrew.boros@us.mcd.com)
Kim Stokluska (kim.stokluska@us.mcd.com)

30348654.1



**McDonald's**

McDonald's Corporation
110 N. Carpenter St.
Chicago, Illinois 60607
Direct Dial Number: (630) 630-5392
Email Address: pauline.levy@us.mcd.com

March 5, 2020

**VIA U.S. Mail**

AmGUARD Insurance Company
Berkshire Hathaway GUARD
Attn: Claims Department
P.O. Box 1368
Wilkes-Barre, PA 18703

| Re: | Insureds: | **Lofton & Lofton Mgmt. Inc., Lofton Holdings Four** |
|---|---|---|
| | (relevant location) | **Inc., Lofton & Lofton Mgmt. V Inc., Lofton** |
| | | **Holdings Seven Inc., McDonald's Corporation, and** |
| | | **McDonald's USA, LLC (5015 W. Madison St., Chicago)** |
| | Policy Nos.: | **LOBP973765** |
| | Policy Terms: | **March 1, 2018 to March 1, 2019** |

Dear Sir/Madam:

Enclosed please find a lawsuit filed on or about November 21, 2019, against, among others, McDonald's Corporation and McDonald's USA, LLC (collectively "McDonald's"), captioned *Sonia Acuña, et al. v. McDonald's Corporation, et al.*, Case No. 2019 CH 13477, in the Circuit Court of Cook County, Illinois, Chancery Division (the "Acuña Lawsuit"), which we provide in accordance with the policy provisions calling for McDonald's to provide notice of a claim or "suit" brought against McDonald's. McDonald's requests that AmGUARD Insurance Company ("AmGUARD") acknowledge and undertake all insuring obligations under any and all applicable policies issued by AmGUARD, including but not limited to its duties to defend and indemnify McDonald's against the Acuña Lawsuit.

McDonald's has retained Elizabeth McRee of Jones Day to serve as defense counsel in the Acuña Lawsuit. The significantly-discounted rates agreed upon for Ms. McRee and her staff are as follows: Ms. McRee - $900/hour; Bethany Biesenthal - $825/hour; Ann-Marie Woods - $600/hour; and Darrius Atkins - $450/hour.

EXHIBIT C

AmGUARD Insurance Company
March 5, 2020
Page 2

Accordingly, please confirm your approval of Jones Day's representation and your agreement to contribute toward the defense fees and costs incurred in connection with the same. We suggest that we set up a call to further discuss the specifics of the defense and its funding.

*This claim is being reported under any and all applicable policies issued by AmGUARD, whether or not cited above.* Please acknowledge receipt of this notice to the undersigned and provide the name and email address of the individual assigned to this matter.

If you require further information, please contact me.

Sincerely,

Pauline Levy
Senior Counsel
McDonald's Corporation

Enc.

cc (via email only):

Andrew A. Boros (andrew.boros@us.mcd.com)
Kim Stokluska (kim.stokluska@us.mcd.com)



Gary Fleming
188 Inverness Drive West
Suite 600
Englewood, CO 80112
GFleming@intactinsurance.com

**August 12, 2021**

**CERTIFIED MAIL - RETURN RECEIPT REQUESTED**

McDonald's Corporation and McDonald's USA, LLC
C/O Paul R. Walker -Bright, Esq.
Neal Gerber & Eisenberg, LLP
Two North LaSalle Street
Chicago, IL 60602-3801
pwalkerbright@nge.com

RE: **INSURED:** Lofton & Lofton Management, Inc.
    **POLICY NO.:** 619-00-00-39-0002
    **POLICY PERIOD:** 3/1/2017 to 3/1/2018
    **UNDERWRITER:** Homeland Insurance Company of New York (Homeland)
    **MATTER:** *Sonia Acuna, et al, v. McDonald's Corporation, et al,* Case No.
    2019CH13477; Cook County Circuit Court, Cook County, Illinois
    **CLAIM NO.:** 0AB332848

Dear Mr. Walker-Bright:

We are in receipt of correspondence in which McDonald's requested that Homeland Insurance Company of New York ("Homeland") defend and indemnify McDonald's Corporation and McDonald's USA, LLC, (collectively "McDonald's") for the above-referenced Action. In those communications, McDonald's asserts that it qualifies as an "insured" under general liability policies issued to Ronnie Lofton d/b/a Lofton & Lofton Management, Inc., ("Lofton"). Homeland issued an @vantage for KAH policy to Lofton, a franchisee of McDonald's, which was in effect between March 1, 2017 and March 1, 2018 (the "Policy"). We have reviewed the allegations of the Actions, as well as the communications mentioned above, in conjunction with a review of the Policy. Based on our review, we have determined that Homeland does not owe a duty to defend or indemnify McDonald's with regard to the allegations of the Action under any of the Policies.

Homeland's analysis is based on the language of the Policy and on the allegations of the Action. I realize that you may dispute the allegations, so please note that in referring to these allegations, Homeland does not mean to imply that any of them are true; however, I must refer to them in making our coverage determination. Homeland investigated this claim pursuant to a full reservation of rights and nothing in this letter should be construed as a waiver of any rights

EXHIBIT D

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 2

available to Homeland under the Policy's terms or applicable law, or of any considerations raised with respect to coverage by Homeland in prior communications.  Our coverage position is set forth below.

<u>BACKGROUND INFORMATION</u>

In order to evaluate and investigate this matter, the allegations in the Action are summarized below.  Please advise me if this summary contains any inaccuracies, although the summary is not intended to be exhaustive or exclusive.  If you believe that I have not accurately described the allegations or if you believe there is additional information that could affect the insurance coverage issues raised by the Actions please advise me accordingly.

Plaintiff Sonia Acuna, ("Plaintiff") Individually and on behalf of all others similarly situated, filed her Second Amended Complaint against McDonald's and its franchisee restaurants operating in the state of Illinois in the Cook County Circuit Court on 12/20/2020.

Generally, the Action referenced above asserts the following allegations:  That each of the Plaintiffs and others similarly situated worked for McDonald's; that each of the Plaintiffs face a daily risk of violence while at work; and that Defendants have been and continue to be negligent in failing to protect their workers from this risk.  The Complaint alleges that Plaintiffs are regularly exposed to violent and criminal behavior by customers and that Plaintiffs suffered physical and psychological harm from the violence they experienced while working at McDonald's restaurants.  Plaintiffs go on to state that the incidents they describe in the Complaint are not random, but foreseeable; that McDonald's is aware of the security risks faced by workers at McDonald's restaurants; that McDonald's has failed to take steps to protect its workers from the risks of the anticipated violent crimes; and, that McDonald's has failed to design its premises to deter such incidents and has failed to adequately train its employees in basic security training.

The Complaint contains nine separate Causes of Action, all of which allege Negligence by McDonald's.  Counts One and Two allege Negligence via McDonald's Voluntary assumption of duty with respect to worker safety and security.

Counts Three and Four allege Negligence via McDonald's Voluntary assumption of duty with respect to certain store design features.

Counts Five and Six allege Negligence via McDonald's Retained control over operational matters affecting worker safety.

Counts Seven and Eight allege Negligence via McDonald's Apparent Agency, and that Plaintiffs assumed that McDonald's would exercise its apparent authority over its franchisees to address incidents of violence such as those experienced and witnessed by the Plaintiffs.

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 3

Count Nine for Negligence seeks Injunctive Relief against the Franchisee Defendants, as the respective employers of the Plaintiffs.

Specific to Lofton, Plaintiff Sonia Acuna alleges that she was employed at a McDonald's restaurant located at 5015 W. Madison Street, in Chicago, IL. She alleges that in January 2019 and March 2019, she witnessed, and was affected by acts of violence while working her shifts at that McDonald's restaurant, that she continues to work at that restaurant where she experienced violent and threatening behavior by customers, and that as a result, she fears for her future safety. Plaintiffs seek damages in excess of $50,000 for each Plaintiff and for any other appropriate relief.

## POLICY INFORMATION

Homeland issued an @vantage for KAH Policy to Lofton, ("the Policy"). The Policy was effective between March 1, 2017 and March 1, 2018. The Policy provided Commercial General Liability coverage subject to liability limits of insurance of $1 million for each occurrence, $1 million for personal and advertising injury, and $2 million general aggregate. The Lofton Policy also contains an Additional Insured endorsement which lists McDonald's Corp as an Additional Insured in its capacity as a landlord or as the grantor of a franchise.

Pertinent portions of the Policy's forms and endorsements are quoted below for your reference. However, we suggest that you read this letter along with a complete copy of the Policy.

## COMMERCIAL GENERAL LIABILITY COVERAGE

The Commercial General Liability coverage includes "Bodily Injury and Property Damage Liability" coverage under Coverage A, "Personal and Advertising Injury Liability" coverage under Coverage B, and "Medical Payments" coverage under Coverage C. Coverage C does not apply because there have been no claims for medical expense for "bodily injury" caused by a qualifying accident. Accordingly, Coverage C will not be discussed further in this letter. If you would like a full recitation of the relevant Coverage C language, please advise and I will be happy to provide that policy language.

**A. Commercial General Liability Insuring Agreements**

The Commercial General Liability coverage insuring agreement for Bodily Injury and Property Damage Liability is found in Section I.A of Form CG 00 01 (04-13). The language from Section I.A is quoted below:

**SECTION I - COVERAGES**

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 4

## COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

* * * *

    **b.** This insurance applies to "bodily injury" and "property damage" only if:

        **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
        **(2)** The "bodily injury" or "property damage" occurs during the policy period;

* * * *

The insuring agreement for Coverage B is provided via Form CG 00 01 (04-13). The relevant policy language for Coverage B is quoted below:

## COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY

**1. Insuring Agreement**

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result.

* * * *

    **b.** This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 5

* * * *

Coverage B. applies to "personal and advertising injury" caused by an offense that occurs during the policy period.

## SECTION II – WHO IS AN INSURED

1.      If you are designated in the Declarations as:

      a.      An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

      b.      A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

      c.      A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

      d.       An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

      e.      A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

* * * *

## ADDITIONAL INSURED - GRANTOR OF FRANCHISE AND LANDLORD ENDORSEMENT - OBPG GL KAH 107 11 14

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.
ADDITIONAL INSURED - WHERE REQUIRED UNDER CONTRACT OR AGREEMENT

This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE FORM

**The following is added to SECTION II - WHO IS AN INSURED:**

WHO IS AN INSURED is amended to include as an insured the person or organization shown in the Schedule, which reads McDonald's Corp.; McDonalds Insurance Dept. C/O Donna Martinotti, but only with respect to their liability as grantor of a franchise and landlord to you.

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 6

### B. Policy Definitions

The following relevant policy definitions are found in **Section V** of Form CG 00 01 (04-13):

**SECTION V – DEFINITIONS**

* * * *

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

* * * *

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" mean injury, including consequential "bodily injury", arising out of one or more of the following offenses:

**a.** False arrest, detention or imprisonment;

**b.** Malicious prosecution;

**c.** The wrongful eviction from, wrongful entry into, or invasion of the right to private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organizations' good, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another advertising idea in your "advertisement"; or

**g.** Infringing upon another's copyright, trade dress or slogan in your "advertisement".

* * * *

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use

shall be deemed to occur at the time of the "occurrence" that caused it.

\* \* \* \*

## COVERAGE DETERMINATION

In order for liability coverage to exist under Coverage A for "bodily injury" or "property damage" under the above-quoted insuring agreement, the alleged "bodily injury" or "property damage" must have been caused by an "occurrence" that takes place during the policy period. Plaintiff Sonia Acuna, who works or worked at the store location listed in the Lofton Policy, alleges that she worked at the McDonald's located at 5015 W. Madison Street, Chicago, IL, for several years leading up to the Complaint. However, the only incidents mentioned in her Complaint took place beginning in January 2019, after the Lofton Policy expired on March 1, 2018. Thus, the allegations fall outside the Homeland Policy period and Homeland therefore declines to provide coverage for defense or indemnification of McDonald's related to the Action.

Moreover, if McDonald's does qualify as an Additional Insured, McDonald's qualifies as an Additional Insured "only with respect to their (McDonald's) liability as grantor of a franchise and landlord to you (Lofton). As such, Homeland reserves its right to deny coverage to McDonald's as the allegations and facts do not claim that any liability related to McDonald's is based on its liability as grantor of a franchise to Lofton or as landlord to Lofton.

In order for liability coverage to exist for "personal and advertising injury" under the above-quoted insuring agreement for Coverage B, there must have been an offense which meets the definitions of "personal and advertising injury". The Plaintiff makes no allegations that defendants conduct resulted in an offense that would qualify as "personal and advertising injury". Thus there is no coverage available under Coverage B for the allegations of Plaintiff's Complaint and thus no duty to defend or indemnify McDonald's under Coverage B.

Based on the foregoing allegations and the language of the pertinent Policy, Homeland has no duty to defend or indemnify McDonald's with respect to the allegations of the Actions.

The coverage determination contained in this letter is based upon the information received from you. If you have any other information which you believe may affect this coverage analysis, please forward that information to me and Homeland will evaluate coverage in light of any new information provided. Please reference the name of the insured and the claim number on all future correspondence.

Homeland expressly reserves all rights available to it under the Policies and applicable law, including but not limited to all Policy exclusions and provisions, whether or not specifically addressed in this letter and all representations, statements, declarations and omissions in connection with the Application. Nothing in this letter enlarges limits or changes any of the

*Sonia Acuna, et al v. McDonald's Corp, et al* Cook County Circuit Court Litigation
Homeland Insurance Company Coverage Determination
Page 8

terms or conditions of the Policy, McDonald's rights, or the rights of Homeland. Homeland further reserves its right to reevaluate its coverage position in the event additional information becomes available.

Part 919 of the Rules of the Illinois Department of Insurance requires that our company advise you that, if you wish to take this matter up with the Illinois Department of Insurance, it maintains a Consumer Division at 122 S. Michigan Avenue, 19th Floor, Chicago, Illinois. You may also contact the Department of Insurance through the following website: http://insurance.illinois.gov  The Department of Insurance may also be contacted by telephone at 312-814-2420 or 217-782-4515.

If you have any questions or concerns about this letter and its contents, please do not hesitate to contact me directly.

If you have any questions regarding this, please do not hesitate to contact the undersigned.

Very truly yours,

*Gary L. Fleming*

Gary L. Fleming
Sr. Claim Consultant
Intact Specialty Solutions
T: (303) 531-3925
F:  (866) 916-3493
GFleming@intactinsurance.com

cc.

KAH Insurance Brokerage, Inc.
bhenry@kahinsurance.com



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

April 29, 2020

***VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED***
***AND FIRST CLASS MAIL***

Pauline Levy
Senior Counsel
McDonald's Corporation
110 N. Carpenter Street
Chicago, Illinois 60607
*Pauline.levy@us.mcd.com*

| | | |
|---|---|---|
| **Re:** | **Insureds:** | Lofton & Lofton Mgmt. Inc., Lofton Holdings Four Inc, Lofton & Lofton Mgmt. V Inc., Lofton Holdings Seven Inc., McDonald's Corporation, McDonald's USA, LLC (5015 W. Madison St., Chicago) |
| | **Lawsuit:** | *Sonia Acuna, et al v. McDonald's Corporation, et al, Cause No. 2019CH13477 in the Circuit Court of Cook County, Illinois, County Department, Chancery Division* (the "Lawsuit") |
| | **Policy No.:** | LOBP973765 |
| | **Policy Period:** | March 1, 2018 to March 1, 2019 |
| | **Date of Loss:** | March 1, 2018 |
| | **Claim No.:** | LOBP973765-002-002-002 |

Dear Ms. Levy:

This letter sets forth AmGUARD Insurance Company's ("AmGUARD") current position with respect to potential insurance coverage for the above-referenced Lawsuit. Sonia Acuña and sixteen other individuals who work at McDonald's restaurants in the Chicago area ("Plaintiffs") filed the Lawsuit against McDonald's Corporation, McDonald's USA, LLC (collectively, "McDonald's") and others alleging that Defendants failed to provide them with a safe work environment. This matter has been submitted to AmGUARD for coverage consideration under AmGUARD Businessowner's Policy Number LOBP973765 (the "Policy").

This letter is to advise you that, after a careful review of the allegations, facts and circumstances of this Lawsuit and the terms, conditions, limitations, exclusions and endorsements of the Policy, AmGUARD has concluded there is no coverage for McDonald's for the Lawsuit under the Policy at this time. **Accordingly, for the reasons set forth in greater detail below, AmGUARD respectfully disclaims any duty to defend or indemnify McDonald's for any loss or damages related to the Lawsuit.**

## I.
## FACTUAL BACKGROUND

By summarizing the allegations in the Lawsuit, AmGUARD does not suggest or otherwise imply that any of those allegations are true, or that AmGUARD believes them to be true. Additionally, AmGUARD does not mean to imply or suggest that there is any basis for the Lawsuit or any demands or any relief sought therein. Rather, AmGUARD discusses the

## EXHIBIT E



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

allegations because they impact coverage for this matter. For a full account of the facts, please refer to the Lawsuit.

In the Complaint filed on November 21, 2109, seventeen Plaintiffs allege that they work at various McDonald's restaurants in the Chicago area. Plaintiffs assert that during 2018 and 2019, they have faced daily risks of violence while at work, and have experienced regular violent and criminal behavior from customers. They detail incidents such as a customer jumping over the counter with a gun, lewd comments and groping from customers, being assaulted or hit by customers, and the discovery of a dead body in a bathroom.

Plaintiff allege that, despite its knowledge of the risk of violence at these stores, McDonald's has instituted policies, procedures, training, and design that have failed to take into account these risks, failed to protect these workers, thereby failing to provide a safe work environment.

Plaintiffs' causes of action include that McDonald's negligently failed to comply with its duty of care to Plaintiff with respect to security issues, and that it is vicariously liable for the negligence of the operators of the stores where Plaintiffs worked. Plaintiffs seek actual damages and injunctive relief requiring Defendants to modify and implement various policies, procedures and training.

**II.**
**THE POLICY**

AmGUARD issued the Policy to Lofton & Lofton Mgmt. Inc. for the policy period from March 1, 2018 to March 1, 2019. Subject to its terms, exclusions, and conditions, the Policy provides liability coverage, subject to a $1,000,000 liability and medical expenses limit for each occurrence, a $2,000,000 products & completed operations aggregate limit, and a $2,000,000 general aggregate limit.

**III.**
**EXPLANATION OF THE COVERAGE ISSUES**

In addressing the basis for AmGUARD's coverage position, we direct your attention to relevant portions of the Policy in whole or in part. Please read the Policy in its entirety as nothing in this letter modifies the terms and conditions of the Policy, which remain controlling.

**A. Businessowner's Coverage Form Section II - LIABILITY**

The Businessowner's Coverage Form (BP 00 03 01 10), SECTION II – LIABILITY insuring agreement provides, in relevant part:

    **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply. We may, at our



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

discretion, investigate any "occurrence" or any offense and settle any claim or "suit" that may result…

***

**b.** This insurance applies:

**(1)** To "bodily injury" and "property damage" only if:

**(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(b)** The "bodily injury" or "property damage" occurs during the policy period; and

**(c)** Prior to the policy period, no insured listed under Paragraph **C.1.** Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known before the policy period.

The insuring agreement requires that the "bodily injury" occurs during the policy period, which is from March 1, 2018 to March 1, 2019. Here, Lawsuit alleges that, throughout 2018 and 2019, numerous instances of employee harassment, abuse and assault by customers occurred at various McDonald's stores in the Chicago area. To the extent the alleged "bodily injury" did not occur during the policy period, there would be no coverage, and AmGUARD reserves its rights on this basis.

Additionally, the Lawsuit alleges that McDonald's has known for decades that crime and violence are significant risks for workers at businesses like its restaurants, and that it has failed to fulfill its duty to protect workers from the violence it knows exists. To the extent, prior to the policy period, an insured or an "employee" authorized to receive notice of an "occurrence" or claim knew that the "bodily injury" alleged in the Lawsuit occurred, in whole or in part, there would be no coverage for this additional reason, and AmGUARD reserves its rights on this basis.

Further, the insuring agreement provides that AmGUARD "will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance does not apply." For the reasons addressed below, this insurance does not apply, and AmGUARD has no duty to defend the insured against the Lawsuit.



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

Endorsement (BP 04 17 01 10) of the Businessowner's Coverage Form includes the following exclusion that provides, in relevant part, this insurance does not apply to "bodily injury" or "personal and advertising injury" to:

(1) A person arising out of any:

    (a)    Refusal to employ that person;

    (b)    Termination of that person's employment; or

    (c)    Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; …

***

This exclusion applies:

(1) Whether the injury-causing event described in Paragraph (a), (b) or (c) above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; an

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

The Lawsuit alleges that, although McDonald's restaurants' day-to-day operations are run by the franchisees, McDonald's retains substantial control over the design, operations and security-related practices and policies of the individual stores. McDonald's provides its restaurants with an Operations and Training Manual, which the franchisees must use in operating their restaurants. These manuals mandate operational procedures and business practices and policies. The Lawsuit alleges that through its control of procedures, training, the design of the stores, and practices like requiring late-night operations, McDonald's has ignored recommended best practices for the safe design of late-night businesses, thereby failing to ensure the safety of its employees. Thus, the "bodily injury" that is alleged in the Lawsuit arises out of McDonald's employment-related practices, policies, acts or omissions, and this exclusion applies to preclude coverage for the Lawsuit.

Additionally, the Businessowner's Coverage Form (BP 00 03 01 10), as amended by the IL Policy Customizations endorsement (BP 99 IL 09 16) provides, in relevant part, this insurance does not apply to:

    **a.**    **Expected Or Intended Injury**

        "Bodily injury" or "property damage" (including any unexpected or unintended portion thereof) if any "bodily injury" or "property damage" was expected or intended from the standpoint of any insured…



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

The Policy's exclusion a. bars coverage for "bodily injury" (including any unexpected or unintended portion thereof) if any "bodily injury" was expected or intended from the standpoint of any insured. Here, the Lawsuit alleges that McDonald's has been aware, for decades, of the significant risk of violence at late-night stores like its McDonald's locations, but that it ignore best practices in order to maximize profits, thereby failing to create a safe work environment for the employees. To the extent the "bodily injury" alleged in the Lawsuit was expected or intended from the standpoint of any insured, there would be no coverage and AmGUARD reserves its rights on this basis.

**IV.**
**CONCLUSION AND ADDITIONAL RESERVATION OF RIGHTS**

**As noted above, because there is no coverage for the claim under the Policy, AmGUARD will not defend your interests with regard to the claim.** _**YOU SHOULD IMMEDIATELY SEEK ALTERNATE COVERAGE AND/OR APPOINT COUNSEL, AT YOUR EXPENSE, TO PROTECT YOUR INTERESTS IN THIS MATTER.**_

The specificity of this disclaimer is not to be construed as a waiver or modification of the terms, conditions, exclusions or limitations of the insurance contract upon which a claim has been made or a waiver of any defenses, which may be available to AmGUARD, all of which are specifically reserved. If you believe our determination was based on information or documentation that is in error, please advise us in writing immediately, and we will promptly reconsider our determination.

Additionally, if you disagree with the position as set forth in this letter, you may contact the Illinois Division of Insurance, 320 W. Washington Street, Springfield, IL 62767-0001, (217) 782-4515.

If you wish to discuss the matters addressed in this letter, please do not hesitate to contact me.

Very truly yours,

*KaSheena Roberts*

Kasheena Roberts
Liability Claims Representative II
BERKSHIRE HATHAWAY GUARD INSURANCE COMPANIES
Kasheena.roberts@guard.com
(570) 825-9900, ext. 7280

Cc:    KEYSTONE PROGRAM GROUP, LLC
        1995 Point Township Drive

5056174v.1



**P & C Claims**
**PO Box 1368**
**Wilkes-Barre, PA 18703**
**P: 800.673.2465**

Northumberland, PA  17857

Pauline Levy
Senior Counsel
110 N Carpenter St
Chicago IL  60607-4106



USPS CERTIFIED MAIL™

9214 8901 1291 6901 6427 97

Code/Claim: LORR073765-002-002-002

